**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HARRAH'S CLUB, Respondent.**

**No. 20270.**

United States Court of Appeals Ninth Circuit.

June 14, 1966.

Rehearing Denied Aug. 5, 1966.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Asst. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Soloman I. Hirsh, Wayne S. Bishop, Attys., N. L. R. B., Washington, D. C., for petitioner.

Nathan R. Berke of Severson, Werson, Berke & Larson, San Francisco, Cal., for respondent.

Sidney R. Korshak, David H. Mendelsohn, Fredric N. Richman, Chicago, Ill., amicus curiae, Nevada Resort Association.

Before CHAMBERS, Circuit Judge, MADDEN, Judge of the Court of Claims, and HAMLEY, Circuit Judge.

HAMLEY, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order requiring Harrah's Club to cease and desist certain unfair labor practices at the company's Lake Tahoe gambling casino in Stateline, Nevada. Respondent opposes enforcement on the ground that the Board's assertion of jurisdiction is arbitrary and an abuse of discretion, and on the further ground that the Board's findings that the company engaged in unfair labor practices are not supported by substantial evidence. The Nevada Resort Association has filed an amicus curiae brief in support of respondent's position on the jurisdictional issue.

On the jurisdictional question respondent and amicus curiae argue, in effect, that because the Board has consistently declined to exercise jurisdiction over racetracks for reasons which are equally applicable to the Nevada gambling industry, the failure of the Board likewise to exempt respondent from regulation is arbitrary and capricious.

The Board has consistently declined to exercise jurisdiction over racetracks.[1] It

---

1. Chronologically: Los Angeles Turf Club, Inc. (1950) 90 N.L.R.B. 20; Pinkerton's National Detective Agency, Inc. (1955) 114 N.L.R.B. 1363; Jefferson Downs, Inc. (1959) 125 N.L.R.B. 386; Hialeah Race Course, Inc. (1959) 125 N.L.R.B. 388; Meadow Stud, Inc. (1961) 130 N.L.R.B. 1202; Walter A. Kelley (1962) 139 N.L.R.B. 744; Hotel & Restaurant Employees Union (Resort Concession, Inc.) (1964) 148 N.L.R.B. 208. The policy of the Board in declining jurisdiction as to racetracks, extends also to breeders and trainers of race horses (Meadow Stud, Inc. and Walter A. Kelley, supra), and food concessionnaires at racetracks (Hotel & Restaurant Employees Union, supra).

has done so pursuant to the authority vested in the Board under section 14(c) (1) of the National Labor Relations Act (Act), 73 Stat. 541 (1959) 29 U.S.C. § 164(c) (1) (1964).[2] The Board's rationale in exempting racetracks from regulation has been that: (a) racetrack operations are essentially local in character so that a labor dispute therein is not likely substantially to disrupt interstate commerce, and (b) racetracks are subject to detailed state regulation which, in the absence of Board regulation may, and probably will, be extended to include labor relations.[3]

The Board denies that (a) of the racetrack rationale, pertaining to the local character of the industry, is applicable to the gambling industry in Nevada. The Board points out that gambling is the major industry of that state and that it annually attracts more than twenty million tourists to Nevada, entailing vast use of interstate transportation facilities.

With regard to (b) of the racetrack rationale, concerning the likelihood of future state regulation of the industry's labor relations, the Board has not taken a clear-cut position. It does not deny that the Nevada gambling industry is subject to detailed state regulation or that, in the absence of Board regulation, Nevada state regulation may, and probably will, be extended to include labor relations. Instead, it takes a firm position with regard to two matters with which the (b) rationale is not concerned. The Board asserts that the fact that Nevada has enacted detailed regulations governing the gambling industry does not prevent the Board from asserting its jurisdiction, and points out that the Nevada Gaming Act does not now govern employer-employee relationships.

The Board has statutory jurisdiction to regulate the labor relations of Harrah's Club.[4] This being true, the exercise of that jurisdiction is subject to review only on the question of whether, under the circumstances, unjust discrimination will result. See N. L. R. B. v. W. B. Jones Lumber Co., 9 Cir., 245 F.2d 388, 391; followed in N. L. R. B. v. Local Joint Executive Bd. of Hotel and Restaurant Employees and Bartenders Union, 9 Cir., 301 F.2d 149, 153. See, also, N. L. R. B. v. Gene Compton's Corp., 9 Cir., 262 F.2d 653, 656; N. L. R. B. v. Carpenters Local No. 2133, 9 Cir., 356 F.2d 464, 465.

Assuming that the criteria applied by the Board in determining to exempt racetracks from regulation are equally applicable to gambling casinos in Nevada, this alone is not sufficient to establish that regulation of the gambling industry will result in unjust discrimination. It must also be shown that the gambling industry will be substantially prejudiced by Board regulation because racetracks are not similarly regulated. See N. L. R. B. v. Gene Compton's Corp., supra.

There is here no contention that the gambling industry will be so prejudiced, and there is nothing in the record to support a finding or conclusion that such prejudice will result. We therefore conclude that the Board did not act arbitrarily and did not abuse its discretion in exerting regulatory jurisdiction over respondent.

The Board found that Harrah's Club violated section 8(a) (1) of the Act,

2. Section 14(c) (1) provides, in pertinent part:

   "(c) (1) The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to the Administrative Procedure Act, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction * * *."

3. See Hialeah Race Course, Inc., supra, at 390–391.

4. Under section 10(a) of the Act, 61 Stat. 146 (1947), 29 U.S.C. § 160(a), (1964), the Board is empowered " * * * to prevent any person from engaging in any unfair labor practice * * * affecting [interstate] commerce."

29 U.S.C. § 158(a) (1) (1964) by coercively interrogating its employees regarding their union activities, threatening them with reprisals because of such activities, and soliciting them to abandon the union as their collective bargaining representative and deal directly with management.[5] Respondent argues that these findings are not supported by substantial evidence.

Viewing the record as a whole, we conclude that these findings are supported by substantial evidence.

■ The Board also found that Harrah's Club violated section 8(a) (3) and (1) of the Act, 29 U.S.C. § 158(a) (3) and (1) (1964), by discharging employee Robert H. Wetherill because of his union activities. Respondent contends that this finding is not supported by substantial evidence.

As indicated by the section 8(a) (1) findings referred to above, the record is replete with evidence of respondent's hostility toward the union. Wetherill was a leading union figure. He was employed by Harrah's Club on August 30, 1962 as a sound console operator. He continued in that job at the South Shore Room of the Lake Tahoe casino until early May, 1963, when he left temporarily due to illness. On his return, on May 30, 1963, Wetherill was transferred at his request to the job of stagehand.

Early in June, 1963, Wetherill became the unsalaried business agent for the Local. About a week later he notified Robert I. Brigham, the company's director of industrial relations, of his position with the union. Several other supervisory employees learned of this soon afterward.[6] Wetherill began to organize the stagehands and, by August 9, had recruited a majority of these employees. On that date he sent Brigham a telegram requesting recognition. On August 14, Wetherill filed a representation petition.[7]

Several days after the filing of the petition and the posting of a copy on the premises, Lein and Vogt spoke to Wetherill in Lein's office. Lein asked Wetherill why he had not told Lein and Vogt about the petition. Wetherill said he did not trust Lein. Lein returned the compliment and Wetherill left. About this same time Lein told Bruce T. Lovelady, a stage technician, how Lein and Vogt had been "put in hot water" with management because they did not know in advance about the filing of the petition. Lein also told Lovelady that "as far as management was concerned they wouldn't trust Bob Wetherill any more." Asked why, Lein said it was because of Wetherill's filing of the petition "after all we had done for him," remarking that Wetherill "had stabbed them in the back."

Wetherill's employment was terminated on September 1, 1963. The reason stated on the termination slip was that Wetherill's discharge was necessary in order to make room for Charles H. Walker, a returning veteran. Seniority at Harrah's Club is determined by departments. Walker had been a member of the entertainment department before he had gone into the armed services. His seniority over Wetherill in that department is conceded and it is not disputed that he had a right to return to his job.

Respondent took the position that Walker's return made it necessary to let Wetherill go because the company was not justified in absorbing an additional employee in the entertainment depart-

---

5. The labor union involved was the International Alliance of Theatrical Stage Employees and Motion Picture Operators of the United States and Canada, Local 363, AFL–CIO (Local or Union).

6. Robert Vincent, director of entertainment; Arthur Barkow, producer; Sy Lein, stage manager; and Jacques A. Vogt, chief lighting technician.

7. On September 5, 1963, respondent entered into a Stipulation for Certification upon Consent Election. A tally of ballots cast in the election, on October 14, 1963, revealed that of twelve eligible voters, eleven cast ballots in favor of the union. On October 18, 1963, respondent filed objections to the election. On February 27, 1964, the Board dismissed the objections and certified the union as exclusive bargaining representative of the employees in the unit found appropriate.

ment, and Wetherill was the junior man. Both of these reasons were made the subject of extensive and largely conflicting testimony, the Board's general counsel taking the position that neither reason was valid.

With regard to the company's desire to avoid any increase in the staff of the entertainment department, Vincent steadfastly maintained that the stage crew had been overstaffed. However, he took no steps to reduce the size of the crew prior to the advent of the union. Early in August, 1963, in a discussion about the possible effect upon the stagehands of the new Wage-Hour Law, Barkow told Lovelady that it appeared that the company was faced with the alternative of scheduling a seven-hour day, six-day work week, or hiring three additional stagehands, to avoid payment of overtime.[8]

With regard to the company's assertion that Wetherill was the junior member of the entertainment department, the question came down to whether, in that department, he had seniority over Paul Jordan or Ray McNerthney. The answer to this question required exploration of several collateral issues, as to each of which the evidence was in dispute.

One of these issues was whether Wetherill was attached to the entertainment staff when he was initially employed as a sound console operator on August 30, 1962, or when he became a stagehand on May 31, 1963. If the earlier date applies, Wetherill had seniority in that department over Jordan, and also over McNerthney if the latter was ever attached to that department.

The general counsel produced evidence tending to show that the sound console operator is considered a member of the entertainment department. This evidence included the testimony of Wetherill to that effect, and a series of time slips signed by Wetherill while he was a sound console operator. The slips list the department as "Stage" which is concededly in the entertainment department. All but one of these slips were signed by Lein, the stage manager in the entertainment department.

Respondent sought to explain these time slips by attributing the "Stage" notation, and the fact that the slips were signed by a supervisor in the entertainment department, to "widespread laxity" prevailing throughout the Club in the signing of such slips. Respondent also adduced additional evidence tending to support its position, including organizational charts and tables showing the entertainment department as separate from the sound department.

The Examiner found that in the actual operation of the South Shore Room, respondent did not maintain such a rigid separation between the departments. The Examiner also found that the functions of the sound console operator who worked in the South Shore Room in connection with the production of shows were more directly related to those of the stage crew than those of the sound department.

The evidence is also in conflict as to whether McNerthney was ever a member of the entertainment department. It seems to be established, however, that McNerthney replaced Wetherill part-time as a sound console operator in May, 1963, and that in July, 1963, upon the direction of supervisory personnel, he began to sign his time slips as an employee of the entertainment department.[9] If McNerthney became a member of the entertainment department on either of these dates

8. Barkow also volunteered that Lein and Vogt had been urging him to hire additional men because, as things were, Vogt had been obliged to do relief work at the spotlight and light board, and Lein had been complaining that he had been unable to give his men vacations and time off. The employment of two additional men, Lein said, would relieve that problem.

9. Respondent had originally selected McNerthney as the one to be terminated to make room for Walker. Early in August, 1963, Producer Barkow informed McNerthney that he was to be replaced by a returning veteran, and advised him to start looking for a job.

**430**

he was junior to Wetherill in that department basing the latter's seniority, as the Examiner did, on the August 30, 1962 date.

The evidence is extensive and in detail on the issue of seniority and other motivations respondent may have had in terminating Wetherill. This is likewise true of the Examiner's findings, which exhibit careful consideration and evaluation of conflicting claims and evidence. Considering the record as a whole we conclude that the Examiner's ultimate finding, adopted by the Board, that respondent discharged Wetherill because of his union activities, is supported by substantial evidence.

The petition will be enforced.