NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The ANTHONY COMPANY d/b/a
Eldorado Club, Respondent.

No. 76–1059.

United States Court of Appeals,
Ninth Circuit.

July 18, 1977.

Margery E. Lieber, Atty., N.L.R.B., Washington, D. C., argued for petitioner.

Larry A. Curtis, argued, Musick, Peeler & Garrett, Los Angeles, Cal., for respondent.

Before CHAMBERS and WALLACE, Circuit Judges, and CRARY,* District Judge.

CHAMBERS, Circuit Judge:

This is an application by the National Labor Relations Board (the Board) under section 10(e) (29 U.S.C. § 160(e)) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 *et seq.*, for enforcement of its order issued against the Anthony Company (the Company), requiring correction of the Company's several alleged unfair labor practices. The Board's decision and order are reported at 220 NLRB No. 152 (1975).

The Company operates a gaming establishment, used for the playing of poker, and an adjoining restaurant in Gardena, California. The restaurant holds about 160 people and the cardroom about 280. The Company employs approximately 200 persons, with only about 65 of these working in the restaurant. All of the employees are covered by the same collective bargaining agreement between the Company and the Culinary Workers and Bartenders Union (the Union).[1] The poker parlor exists by local option, being operated solely pursuant to local ordinances. Thus, the card parlor is subject to strict control and regulation by the Gardena City Council on such matters as licensing, revenue reports, betting limits, age limits, hours of operation and advertising. There is no state supervision of the industry. Approximately 300 such poker parlors exist in California, with six similar parlors in Gardena alone. Although advertising of the casino is not permitted under the local regulations, the Company can and does advertise its restaurant inside and out of California. The vast majority of the Company's patrons are local, or at least from California. With respect to its financial structure, the Company annually imports from out-of-state suppliers about $50,000 worth of playing cards and $125,000 worth of meat for the restaurant. The Company receives approximately $3 million a year in gross revenue from its combined restaurant-gaming operation.

The card parlor, which is the only portion of the Company's business involved here, operates in the following manner. The Company "rents" seats to card-playing customers, who sit at tables divided into three distinct sections for card games. In the first section (section I), the card games have the highest stakes and the highest rental price for a seat. Additionally, the tips given to employees in section I are the largest and most frequent, since new decks are "broken" most often in games in section I, and tips usually accompany the breaking of each new deck. The stakes, rental price for a seat, and employees' tips decrease in sections II and III, respectively. The rent for chairs is collected every one-half hour by chipgirls, whose activities are overseen by floormen. The floormen basically break new decks of cards at certain time intervals. On each work shift there is generally one floorman covering each of the three sections and one relief floorman to substitute during the former's breaks. Floormen are supervised by a manager who reports to the owner-operator, George Anthony. Both chipgirls and floormen receive tips for their services. Since tips for floormen are larger and more frequent in section I, the more

---

* The Honorable E. Avery Crary, Senior United States District Judge, Central District of California, sitting by designation.

1. Local No. 814 (AFL-CIO). The collective bargaining agreement involved here ran from June 23, 1973, through June 23, 1976, and provided for a grievance-arbitration procedure.

senior floormen predominate in that section.

The unfair labor practices found in this case relate to the Company's treatment of two of its floormen-employees, Melvin Hogg and Richard Flynn. Hogg, a 13-year employee and senior floorman in section I, was terminated in December, 1973, and his grievance through the Union resulted in arbitration. Flynn, a relief floorman covering all three sections during the previous three years, attended the first of two sessions of Hogg's arbitration hearing on March 13, 1974. During the next few months, Flynn received several warnings for lateness; his work schedule was altered such that he received little or no time in sections I or II and consequently lost out on the tips that attended the more frequent breaking of new decks there; and he received a three-day suspension for failing to timely turn in his collection slips. When Flynn complained about being mistreated because of his appearance at Hogg's arbitration hearing, Flynn was told that he "wasn't on the Company's ball team" and "would have to take it like a man." Flynn ultimately was discharged for having received three lateness warnings.

On July 19, 1974, the arbitrator found Hogg's December, 1973, discharge unjustified and therefore ordered his reinstatement with full seniority and back pay. Upon Hogg's return to work, he was seen with a cigarette on the casino floor. A new company rule initiated during his absence but made known to him prohibited such smoking. Hogg and other employees present claimed that he had merely picked up a stray cigarette from the floor to discard it, but George Anthony claimed to have seen Hogg smoking it. Hogg was therefore given a written warning for the rule infraction, the first of its kind. In late August, 1974, as a result of a mandatory change in opening and closing hours imposed by an amended city ordinance, with no corresponding change in customers' playing times, Hogg's break at work coincided with a time of heavy breaking of new decks. Consequently, the relief floorman

rather than Hogg benefitted from the tips that accompanied such breaks, and Hogg's intake decreased drastically. Despite Hogg's pleas, no efforts were made by the Company to adjust Hogg's work schedule to permit him to receive a reasonable amount of card breaks.

On these facts, the Board, adopting the findings, conclusions and recommended order of the Administrative Law Judge, found that the Company was within the Board's statutory and discretionary jurisdiction, and that exercising its jurisdiction would effectuate the policies of the Act; that the Company violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by making coercive statements to employees; that the Company violated sections 8(a)(3) and (1) of the Act, id. § 158(a)(1), (3), by discharging Flynn and by discriminating against both Flynn and Hogg because of their participation in the Union's grievance-arbitration procedure set forth in the collective bargaining agreement; and that the case was not appropriate for deferral to arbitration under that agreement. The Board's order requires the Company to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining or coercing employees in the exercise of their statutory rights. The order also requires the Company to offer reinstatement and restoration of all rights to Flynn, to make Flynn and Hogg whole for any lost earnings they suffered because of the Company's unlawful discrimination against them, and to post appropriate notices. The Board now seeks enforcement of this order.

The Company first argues that the Board abused its discretion by arbitrarily asserting jurisdiction over its card parlor. There is no dispute that the Board had statutory power under section 10(a) of the Act, 29 U.S.C. § 160(a), to assert jurisdiction, but rather the Company urges that the Board's discretionary jurisdiction under section 14(c)(1), id. § 164(c)(1), was improperly exercised. The Company bases its argument on the Board's repeated refusal to

assert jurisdiction over racetracks,[2] claiming that the considerations underlying that refusal apply with equal force to card parlors. With regard to racetracks, the Board has not entered the picture because of the local nature of their operations, the extensive local regulation and control of the industry, their insubstantial impact on interstate commerce and the Board's conclusion that exercise of its discretionary jurisdiction over them would not substantially contribute to stability in labor regulation.[3] As this court recently recognized, "(t)he extent to which the Board 'chooses to exercise its statutory jurisdiction is a matter of administrative policy within the Board's discretion, . . . and is not a question for the courts, . . . in the absence of extraordinary circumstances, such as unjust discrimination.' " *NLRB v. Timberland Packing Corp.*, 550 F.2d 500, 501 (9th Cir. 1977), quoting *NLRB v. Carroll-Naslund Disposal, Inc.*, 359 F.2d 779, 780 (9th Cir. 1966); see *NLRB v. Harrah's Club*, 362 F.2d 425, 427 (9th Cir. 1966), cert. denied, 386 U.S. 915, 87 S.Ct. 859, 17 L.Ed.2d 788 (1967). Moreover, substantial prejudice flowing from the Board's assertion of jurisdiction over one industry but not another must be shown. *NLRB v. Harrah's Club, supra*, at 427. Neither unjust discrimination nor substantial prejudice were established in this case. It is also clear that this particular card parlor is dissimilar from the unencompassed racetracks in several respects. The Company's game room is operated in close connection with its adjacent restaurant, which admittedly is engaged in a substantial amount of interstate commerce. The Company employs a relatively stable, full-time work force with a lower turnover rate than that characterizing the racetrack industry. Finally, the extensive local regulations controlling the Gardena card parlors do not address the matter of labor relations, and thus they do not render the Board's involvement unnecessary or redundant. Therefore, we conclude that the Board properly exercised its discretion in asserting jurisdiction over the card parlor here.

■ The Company next alleges that it was denied a fair hearing by the Administrative Law Judge and thereby deprived of due process of law. The Judge allegedly was unduly biased in crediting the testimony of all of the General Counsel's witnesses and discrediting the conflicting testimony of all of the Company's witnesses, and also abused his discretion in failing to properly weigh the evidence in arriving at a determination as to its preponderance. In support of its argument, the Company points to a string of labor relations cases in which this particular Administrative Law Judge repeatedly made blanket credibility resolutions in favor of the Board and against the employer. Be that as it may, the Administrative Law Judge has the responsibility of evaluating the credibility of the witnesses and the weight to be given their testimony, *NLRB v. Vegas Vic, Inc. d/b/a Pioneer Club*, 546 F.2d 828 (9th Cir. 1976), and his credibility resolutions will not be overturned unless found to be inherently incredible or patently unreasonable. *United Ass'n of Journeymen & Apprentices, etc. v. NLRB*, 553 F.2d 1202 (9th Cir. 1977); *NLRB v. Ayer Lar Sanitarium*, 436 F.2d 45 (9th Cir. 1970).[4] While obvious indications

---

**2.** See 29 CFR § 103.3 (1976); *Walter A. Kelley*, 139 NLRB 744 (1962); *Meadow Stud, Inc.*, 130 NLRB 1202 (1961); *Hialeah Race Course, Inc.*, 125 NLRB 388 (1959); *Jefferson Downs, Inc.*, 125 NLRB 386 (1959); *Independent Ass'n of Pari-Mutuel Emp. v. Gulfstream Racing Ass'n, Inc.*, 407 F.Supp. 855 (S.D.Fla.1976).

**3.** See authorities cited note 2 supra. In contrast, the Board has determined that assertion of its jurisdiction over Nevada gambling establishments is warranted. See *El Dorado Club*, 151 NLRB 579 (1965). In *NLRB v. Harrah's Club*, 362 F.2d 425 (9th Cir. 1966), this court upheld the Board's exercise of jurisdiction over

a Nevada gambling casino, notwithstanding the Board's established policy of not invoking its jurisdiction over racetracks.

**4.** As this court recently stated in *United Ass'n of Journeymen & Apprentices, etc. v. NLRB, supra*, "(w)here the trier of fact has made explicit findings crediting the testimony of witnesses for one side, and has given no credit to witnesses for the other side, we are especially reluctant to overturn his conclusions." In his lengthy decision, the Administrative Law Judge here made such explicit findings of credibility.

of judicial bias or incompetence will not be disregarded by a reviewing court, we cannot conclude on this record that the Administrative Law Judge was so clearly biased or that his methods of evaluating the testimony were so improper or arbitrary as to render his credibility resolutions vulnerable. *See NLRB v. Central Press*, 527 F.2d 1156 (9th Cir. 1975).

■ The Company contends that there is not substantial evidence in the record as a whole to support the Administrative Law Judge and the Board's finding that the Company coerced, restrained and discriminated against its employees Flynn and Hogg in violation of sections 8(a)(1) and (3) of the Act. We disagree. Reference to the facts above indicates that there was sufficient direct and circumstantial evidence to support the conclusion that the Company's treatment of Flynn and Hogg was motivated by their participation in Hogg's arbitration hearing. The Board could reasonably infer from the evidence that all but one of Flynn's written warnings for lateness, his three-day suspension for failing to timely turn in his collection slips, the change in his work schedule and his ultimate discharge were attributable to the Company's unhappiness with Flynn's appearance at Hogg's arbitration hearing. With respect to Hogg, substantial evidence similarly exists to support the Board's finding that the warning for Hogg's allegedly smoking on the cardroom floor in violation of a new company rule was actually motivated by Hogg's successful resort to the grievance-arbitration procedure to challenge adverse actions taken against him by the Company.

The last of the Company's unfair labor practices found by the Administrative Law Judge and the Board is more troublesome. While the above violations relating to Flynn and Hogg arose from discriminatory, unlawfully motivated actions by the Company, this final alleged violation instead arose from the Company's inaction with respect to Hogg's request to have his work schedule adjusted after August, 1974. Following the arbitrator's favorable decision on July 19, 1974, Hogg was reinstated with full seniority and back pay. In late August, the Company's operating hours were changed because of an amendment to the city ordinance, requiring the club to open an hour later than before. As a result, the work schedules of all club employees were correspondingly moved back one hour. The combination of this change with the unaltered card-playing patterns of the Company's customers resulted in a situation where the major time for breaking of new decks coincided with the time when Hogg was scheduled to take his relief break. Consequently, Hogg's opportunity for breaking new decks was less than one-third of what it was before the schedule change, and tips which he used to receive went instead to his relief man.[5]

On these facts, the Administrative Law Judge and the Board found that the Company violated section 8(a)(1) and (3) by failing to take affirmative steps, pursuant to Hogg's requests, to rearrange or adjust his schedule so as to allow him to regain some of the tips that the schedule change deprived him of. We have difficulty with the general proposition that an employer must make special provisions for an employee who is adversely affected by a change in working terms or conditions, even though the change is nondiscriminatorily imposed without any action on the employer's part and uniformly affects all employees. *See Gulf Building Corp.*, 159 NLRB No. 122 (1966). Nevertheless, we believe substantial evidence supports the Board's finding of a violation in this particular case. The record reveals that after the August schedule change, Hogg complained to the Company managers Hackman and John Anthony several times that he (Hogg) was not getting enough decks to break and was being

---

5. Since tips are undoubtedly a reasonable expectation of the club's floormen and part of their anticipated remuneration, we believe Hogg's lost tips at issue here constitute a "term or condition of employment" within the meaning of section 8(a)(3). *Cf. NLRB v. Electro Vector, Inc.*, 539 F.2d 35 (9th Cir. 1976).

discriminated against. Hogg also testified that, to his knowledge, he was the only employee so adversely affected by the schedule change. Aside from this, there is a noticeable lack of any evidence indicating that other employees were similarly disadvantaged or, if any were, that they, like Hogg, sought and were denied a beneficial adjustment in their personal work schedules. Company manager Hackman, who had the responsibility to set work schedules and claimed to deal equally and fairly with all employees, generally was aware that under the new hours the times for changing decks fell within Hogg's break time. Under these circumstances, while the question is a close one, the Board could rationally infer that the Company's refusal to at least slightly modify Hogg's work schedule, allowing him to benefit from a reasonable amount of card breaks, was based on its displeasure with Hogg's persistent and successful use of the grievance-arbitration machinery and thus in violation of the Act.[6]

Therefore, we conclude that the Board's order shall be enforced in full.

---

[6]. The Board also rejected the Company's contention that the Board should have deferred to the arbitration procedure set forth in the collective bargaining agreement. Although the Company apparently has abandoned this contention on appeal, the Board's refusal to defer in this case cannot seriously be questioned. *See Stephenson v. NLRB*, 550 F.2d 535, 537 (9th Cir. 1977), *citing Hawaiian Hauling Service, Ltd. v. NLRB*, 545 F.2d 674, 675–76 (9th Cir. 1976); *Joseph T. Ryerson & Sons, Inc.*, 199 NLRB No. 44 (1972).