The NEW YORK RACING ASSOCIATION INC., Plaintiff-Appellee,

v.

NATIONAL LABOR RELATIONS BOARD and New York State Labor Relations Board, Defendants-Appellants.

Nos. 832, 1019, Dockets 82–6252, 6258.

United States Court of Appeals, Second Circuit.

Argued Feb. 3, 1983.

Decided May 10, 1983.

Certiorari Denied Oct. 17, 1983.

See 104 S.Ct. 276.

Norbert M. Phillips, Gen. Counsel, New York State Labor Relations Bd., New York City (James M. O'Neill, Washington, D.C., of counsel), for defendant-appellant New York State Labor Relations Bd.

Corinna Lothar Metcalf, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Asst. Gen. Counsel for Special Litigation, N.L. R.B., Washington, D.C., of counsel), for defendant-appellant, N.L.R.B.

Henry Bisgaier, New York City (Cahill, Gordon & Reindel, Joel C. Balsam, William L. Dennis, P.C., Richard Coll, New York City, of counsel), for plaintiff-appellee.

Before FEINBERG, Chief Judge, and LUMBARD and KEARSE, Circuit Judges.

FEINBERG, Chief Judge:

This appeal raises complex questions regarding the jurisdiction of a district court to review a decision of the National Labor Relations Board declining to take jurisdiction over labor disputes in a particular industry.[1] Plaintiff-appellee The New York Racing Association Inc. (the Racing Association) challenges decisions of defendant-appellant NLRB declining to assert jurisdiction over the horse racing industry in general and the Racing Association in particular. The United States District Court for the Eastern District of New York, Jack B. Weinstein, Ch. J., held that the NLRB's decisions were not based on adequate factual investigations and findings, and were therefore unlawful. The district court made its own findings of fact and conclusions of law and remanded the case to the Board for further proceedings. For the reasons stated below, we hold that the district court was without jurisdiction to review the NLRB's decisions, and we reverse with instructions to dismiss the complaint.

### I. Facts

The Racing Association conducts thoroughbred horse racing and pari-mutuel wagering at three racetracks in New York. There is no dispute that the Racing Association's activities affect interstate commerce and generate hundreds of millions of dollars

---

1. For convenience, we hereafter refer to the National Labor Relations Board as the NLRB or the Board.

of gross income. The relations between the Racing Association and its some 1,700 employees are nevertheless regulated by defendant-appellant New York State Labor Relations Board (the State Board) rather than by the NLRB. This is because the NLRB has always declined to take jurisdiction over labor relations in the horse racing and dog racing industries. Indeed, since its creation the NLRB has never exercised all of its broad statutory jurisdiction, which extends to the limits of the commerce clause. See *NLRB v. Children's Baptist Home,* 576 F.2d 256, 258 n. 1 (9th Cir.1978); *NLRB v. Marinor Inns, Inc.,* 445 F.2d 538, 541 (5th Cir.1971). Over the years, however, the NLRB has from time to time reconsidered its policy of not regulating a particular industry, and in some instances, it has reversed its position and exercised jurisdiction. E.g., Cornell University, 183 NLRB 329 (1970) (non-profit education). Cf. Volusia Jai Alai, Inc., 221 NLRB 1280 (1975) (jai alai); El Dorado Inc., 151 NLRB 579 (1965) (casino gambling).

In 1975, the NLRB considered such a reversal of its position regarding the horse racing and dog racing industries. Following the informal rule-making procedures of the Administrative Procedure Act, 5 U.S.C. § 553, it announced in the Federal Register its intention to consider promulgating a rule asserting jurisdiction over these industries and inviting comment by interested parties. The NLRB received approximately 90 responses to this notice, the vast majority of which opposed the assertion of jurisdiction by the NLRB. After considering this record, the Board decided to continue to decline jurisdiction, and in April 1973, promulgated Rule 103.3, which provides as follows:

> The Board will not assert its jurisdiction in any proceeding under sections 8, 9, and 10 of the act involving the horseracing and dogracing industries.

38 Fed.Reg. 9507 (1973), codified at 29 C.F.R. § 103.3 (1982). The Board noted in an accompanying explanatory statement that the states exercised extensive control over the horse racing and dog racing industries, including some aspects of labor relations. It also found that employment in these industries was generally part-time, short-term, and sporadic, suggesting that the impact on commerce was minimal and that national regulation would be difficult and ineffective. Finally, the NLRB mentioned that few labor disputes had occurred in these industries in recent years. Its conclusion was that "the impact of labor disputes in these industries is insubstantial and does not warrant the Board's exercise of jurisdiction." 38 Fed.Reg. 9537 (1973).

In 1979, the Racing Association and the American Totalisator Company, Inc., filed petitions with the NLRB requesting the Board to repeal or amend Rule 103.3 and to assert jurisdiction over the horse racing and dog racing industries. The NLRB denied these petitions and announced its intention to "continue to decline to assert jurisdiction over labor disputes in these industries." 243 NLRB 314, 315 (1979). The NLRB acknowledged that "the operations of the Petitioners herein as a part of the horseracing industry are related to interstate commerce," id., but justified its decision to continue its long-standing policy by Congress' failure to overrule it in the Interstate Horseracing Act of 1978, and by the NLRB's inability to extend its jurisdiction without aggravating its already critical backlog of work. Chairman John H. Fanning and Member John C. Truesdale dissented, stating that the industries' substantial impact on commerce, recognized by Congress in the 1978 Act, as well as predictions in the press of unrest in the industries, warranted the exercise of jurisdiction.

In 1980, the Racing Association again asked the NLRB to take jurisdiction over it, this time by filing a petition under the National Labor Relations Act (the Act), 29 U.S.C. § 159(c)(1)(B), for an investigation and certification of bargaining representatives. Board Case No. 29–RM–635 (1980). In September 1980, the Regional Director denied the request on the grounds that "it would not effectuate the purposes of the Act to assert jurisdiction herein," relying on the Board's consistent policy on the horse racing industry, embodied in Rule 103.3.

The Association thereafter filed this suit for declaratory and injunctive relief against the 1979 decision of the NLRB as well as the 1980 decision of the Regional Director. The complaint demanded, among other things, a writ of mandamus compelling the NLRB to repeal or amend Rule 103.3 and to assert jurisdiction over the Racing Association, and a writ of prohibition forbidding the State Board to exercise any jurisdiction over the Association inconsistent with the NLRB's jurisdiction. The request that the NLRB take jurisdiction is an unusual position for an employer to espouse. It is doubtless relevant that the NLRB, unlike the State Board, hears complaints of unfair labor practices against unions brought by employers as well as the more customary charges brought against employers. Judge Weinstein denied defendants' motions to dismiss, or for summary judgment, for lack of subject matter jurisdiction and failure to state a claim on which relief can be granted. He conducted a bench trial at which the Association presented documentary and testimonial evidence; defendants did not present evidence, maintaining instead that the district court was confined to review of the administrative record.

In July 1982, the judge filed a memorandum and order remanding to the NLRB "the decisions ... declining jurisdiction" over the Racing Association for reconsideration in light of his findings of fact and law. He set out extensive findings of fact on the dollar amount of business generated by the Association, the nature and number of the Association's work force and the conditions of employment, the NLRB's exercise of jurisdiction over other industries such as jai alai, casino gambling, utilities and hospitals, and figures on attendance and wagering at various sporting events across the country, including racing. He found that 29 U.S.C. §§ 159(c)(1) and 164(c)(1) gave rise to a statutory right of employers to representation hearings unless the NLRB's decision not to assert jurisdiction was based on a proper factual investigation leading to "a reasoned opinion that no labor dispute involving that class or industry will sufficiently impact interstate commerce." The judge found that because they violated this right, the decisions complained of in this action were reviewable by the District Court under *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Judge Weinstein concluded:

> Neither in promulgating Rule 103.3 nor in denying plaintiff's petition for a representation hearing, did the Board conduct the requisite inquiry into the volume of commerce affected by potential labor disputes involving the racing industry generally or plaintiff in particular.

In deference to Board expertise, however, he declined

> to assume that the Board may not conclude that no labor dispute in the horse-racing industry can substantially affect interstate commerce.

Instead, Judge Weinstein remanded the decisions to the Board for reconsideration in light of his findings of fact and law "and such other data as the Board may care to consider."

Defendants urge on appeal that the District Court did not have jurisdiction to review Rule 103.3, the 1979 decision of the NLRB, or the 1980 decision of its Regional Director, and that even if the district court did have jurisdiction, it erred in concluding that the NLRB abused its discretion in promulgating and refusing to amend or repeal the rule.

## II. The District Court's Jurisdiction to Review

■ At the outset, it is important to distinguish the two types of decision at issue in this suit. The NLRB's promulgation of Rule 103.3 and its subsequent refusal in 1979 to repeal or amend that rule are governed by the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq. See 29 U.S.C. § 156. The Racing Association's 1980 petition to the Board, on the other hand, was filed pursuant to section 9(c)(1) of the Act, 29 U.S.C. § 159(c)(1), and the Regional Director's decision represents a determination under that section that no hearing was necessary and that there would be no further proceedings. *Leedom v. Kyne,* supra, relied

on by the district court in finding jurisdiction to review, provides only for review of certain section 9 proceedings. To determine whether the court had jurisdiction to review the promulgation of Rule 103.3 and the 1979 decision, we must look first to the APA.

### A. Judicial Review Under the APA

■ 1. *Review of the merits of the Board's decision.* Chapter 7 of the APA, 5 U.S.C. § .701 et seq., provides a right of judicial review of agency action to "[a] person suffering legal wrong because of agency action...." 5 U.S.C. § 702. It does not, however, constitute an independent grant of subject matter jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977). Furthermore, chapter 7 does not apply "to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Our analysis leads us to conclude that the Board's 1973 and 1979 decisions to decline jurisdiction over the horse racing industry are matters within the second of these two exceptions to judicial review, and that therefore the district court had no jurisdiction to review the agency actions.

Section 701(a)(2) of the APA has generated disagreement in the courts, see, e.g., *Reece v. United States,* 455 F.2d 240 (9th Cir.1972); *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 302–03 & n. 13 (2d Cir. 1971); *Littell v. Morton,* 445 F.2d 1207 (4th Cir.1971); *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 874–75 (D.C.Cir. 1970); *Hospital Ass'n of New York State, Inc. v. Toia,* 438 F.Supp. 866 (S.D.N.Y.1977), and fierce debate in the law reviews, see, e.g., Berger, *Administrative Arbitrariness: A Synthesis,* 78 Yale L.J. 965 (1969); Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion",* 82 Harv.L.Rev. 367 (1968) (citing articles at 372–73 nn. 28–29); Berger, *Administrative Arbitrariness—A Reply to Professor Davis,* 114 U.Pa.L.Rev. 783 (1966); Davis, *Administrative Arbitrariness—A Postscript,* 114 U.Pa.L.Rev. 823 (1966).

The disagreement originates in the seeming inconsistency between the exception in section 701(a) of discretionary matters from the general rule of judicial review and the subsequent APA provision that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... an abuse of discretion ...." 5 U.S.C. § 706(2)(A). As Judge Friendly has written, "[t]he difficulty is that if the exception were read in its literal breadth, it would swallow a much larger portion of the general rule of reviewability than Congress could have intended, particularly in light of 5 U.S.C. § 706(2)(A) ...; yet to read the exception out completely would do violence to an equally plain Congressional purpose." *Langevin v. Chenango Court,* supra, 447 F.2d at 302–03.

This court has wrestled with this difficulty. In one case, it has seemed to rely on a distinction between ordinary discretion, reviewable for abuse, and discretion that is unreviewable because it " 'is not subject to the restraint of the obligation of reasoned decision....' " *Wong Wing Hang v. INS,* 360 F.2d 715, 718 (2d Cir.1966) (quoting Hart & Sacks, The Legal Process 172, 175–77 (Tent. ed. 1958)). Similarly, in *Cappadora v. Celebrezze,* 356 F.2d 1 (2d Cir.1966), the court considered the critical question for judicial review to be whether the agency had *absolute* discretion. Id. at 5. In another case, we apparently adopted Professor Davis's "formulation 'that administrative action is usually reviewable unless either (a) congressional intent is discernible to make it unreviewable, or (b) the subject matter is for some reason inappropriate for judicial consideration.' " *Langevin v. Chenango Court,* supra, 447 F.2d at 303 (quoting Davis, Administrative Law Treatise, 1970 Supplement, § 28.16 at 965). In a subsequent case we held that where a statute meets the test of *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)—i.e., is "drawn in such broad terms that in a given case there is no law to apply," id. at 410, 91 S.Ct. at 820—judicial review is precluded by section 701(a)(2) even in the absence of clear and convincing evidence of legislative

intent to make the action at issue unreviewable. *Greater New York Hospital Ass'n v. Mathews,* 536 F.2d 494 (2d Cir.1976).

■ Out of these various formulations, however, one general principal does emerge with reasonable clarity. As the Supreme Court said in *Barlow v. Collins,* 397 U.S. 159, 166–67, 90 S.Ct. 832, 837–38, 25 L.Ed.2d 192 (1970), judicial review is the rule, and preclusion under section 701(a)(1) and (2) the exception; but if clear and convincing evidence can be shown that Congress intended to make an agency action unreviewable, then the courts are without jurisdiction. Evidence of congressional intent can, of course, be found in many places. The starting point is the language of the statute granting the agency power. If it makes no mention of discretion, and provides clear and detailed standards for agency action, e.g., *Overton Park,* supra, or if, conversely, it allows regulation "as the Secretary believes appropriate" and provides no standards at all, *Greater New York Hospital Ass'n v. Mathews,* supra, 536 F.2d at 497, the inquiry need go no further: It was reasonably clear on the face of the statutes that there was jurisdiction to review in the former case but not in the latter. But in the more usual case, where the language of the statute is not in itself sufficient evidence of whether Congress intended to grant unreviewable discretion, the court will look to other indications of congressional intent: the nature of the agency action involved, the amount of expertise required, the place of the particular action and of judicial review in the overall statutory scheme governing the agency and, of course, the legislative history of the statute. See *Barlow v. Collins,* supra, 397 U.S. at 166, 90 S.Ct. at 837 (where controversy was over the meaning of a statutory term, judicial review was particularly appropriate); *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1044 (D.C.Cir.1979) (factors to be considered include the impact of review on agency effectiveness and the appropriateness of issues raised for judicial review); *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d 574, 578 (3d Cir. 1979) (court must make "fair appraisal of the entire legislative scheme," considering breadth of discretion granted and extent of agency expertise involved); *Greater New York Hospital Ass'n v. Mathews,* supra, 536 F.2d at 498 (decision of HEW about timing of Medicare reimbursements not appropriate for judicial review); *Langevin v. Chenango Court,* supra, 447 F.2d at 303 (factors indicating Congress' intent to grant unreviewable discretion include the managerial nature of the agency's responsibilities, "the need for expedition to achieve the Congressional objective," and the flood of appeals that would result if this type of action were reviewable); *Cappadora v. Celebrezze,* supra, 356 F.2d at 6 (court considered "whether such a decision is totally committed to the judgment of the agency because of the practical requirements of the task to be performed, absence of available standards against which to measure the administrative action, or even the fact that no useful purpose could be served by judicial review"); *Hospital Ass'n of New York State, Inc. v. Toia,* supra, 438 F.Supp. at 868 (factors to consider in applying § 701(a)(2) exception include whether there is no law to apply, what congressional intent was, and whether the subject matter is appropriate for judicial review). See also Saferstein, supra, especially the discussion of factors to consider in analysis of whether Congress intended to preclude review, 82 Harv.L.Rev. at 377–95.

Against this background, we turn to section 14(c) of the Act, on which the NLRB relies as authority for its policy of not asserting jurisdiction over the horse racing industry. That section provides:

(1) The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to subchapter II of chapter 5 of Title 5 [the Administrative Procedure Act], decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: *Provided,* That the Board shall not decline to assert

jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.

(2) Nothing in this subchapter shall be deemed to prevent or bar any agency or the courts of any State or Territory (including the Commonwealth of Puerto Rico, Guam, and the Virgin Islands), from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction.

29 U.S.C. § 164(c). The language of subsection (1) immediately suggests that the decision to decline jurisdiction is "committed to agency discretion": not only does it speak of the Board's "discretion" in a general way, but it specifically grants the Board power to decline jurisdiction "where, *in the opinion of the Board,* the effect of such labor dispute on commerce *is not sufficiently substantial to warrant* the exercise of its jurisdiction" (emphasis supplied). The italicized words make clear that even if the effect on commerce of disputes in a particular case or industry is substantial, the Board has the power to make the judgment that the assertion of jurisdiction is not warranted. The impact of labor disputes— not of the industry—on commerce is made a primary consideration, but whether or not it is sufficient to warrant exercise of jurisdiction is a relative question, and the other factors that the Board will consider in weighing its decision are left unstated.

The extent of discretion that is inherent in these words is illuminated by the contrast with the proviso in section 14(c)(1). There, Congress imposed a precisely defined limit on the Board's discretion, stated in terms of established standards and using the clearly mandatory words "shall not." Thus, like the statute in *Greater New York Hospital Ass'n v. Mathew,* supra, which granted the Secretary of HEW complete and unreviewable discretion to determine when Medicare reimbursements would be made, so long as it was done at least once a month, section 14(c)(1) grants broad discretion, limited only by the requirement of the proviso.

The legislative history of section 14(c) confirms that it grants very broad discretion. We have already pointed out that the Board's jurisdiction reaches to the limits of the commerce clause, but the Board has never asserted all of that jurisdiction. As the Supreme Court noted, eight years before the enactment of section 14(c):

> Even when the effect of activities on interstate commerce is sufficient to enable the Board to take jurisdiction of a complaint, the Board sometimes properly declines to do so, stating that the policies of the Act would not be effectuated by its assertion of jurisdiction in that case.

*NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 684, 71 S.Ct. 943, 949, 95 L.Ed. 1284 (1951). The horse racing and dog racing industries were among those over which the Board had never exercised its jurisdiction.

The NLRB's failure to take jurisdiction over all cases and all industries within its potential range became problematical, however, in 1957, when the Supreme Court ruled for the first time that Congress had pre-empted the field of labor relations affecting interstate commerce, thereby precluding state regulation even when the Board had declined to exercise its jurisdiction. *Guss v. Utah Labor Relations Board,* 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957). This compounded the already existing problem that states were not stepping in to regulate whenever the NLRB declined to act. The result was a "no-man's-land" in labor relations, in which some businesses and industries were left completely unregulated. By 1959, when Congress addressed itself to the situation by adding section 14(c) to the Act, the Supreme Court had already taken a step towards providing a solution. In *Office Employes v. NLRB,* 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957) and *Hotel Employees v. Leedom,* 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958), the Court ruled that the Board could not rely on policies declining jurisdiction over entire classes of employees.

Congress considered continuing and extending this approach to the problem by requiring the Board to assert jurisdiction over all labor disputes within its statutory jurisdiction, that is, over all labor disputes affecting interstate commerce. H.R. 8342, 86th Cong., 1st Sess. (1959), *reprinted in* 1 NLRB Legislative History of the Labor Management Reporting and Disclosure Act of 1959, at 687 (1959) [hereinafter cited as *Leg.Hist.*]. This approach was ultimately rejected because it was recognized that the Board could not cope with the volume of cases that would be thrust upon it. See, e.g., 105 Cong.Rec. 6537–38 (1959) (remarks of Sen. Goldwater), *reprinted in* 2 *Leg.Hist.* at 1143; 105 Cong.Rec. 14,346–47 (1959), (analysis introduced by Rep. Griffin), *reprinted in* 2 *Leg.Hist.* at 1522; 105 Cong. Rec. 15,546 (1959) (remarks of Rep. Dixon), *reprinted in* 2 *Leg.Hist.* at 1582. Congress also considered and rejected a version of the statute that would have required the Board to issue written standards for when it would take jurisdiction, S. 1386, 86th Cong., 1st Sess. (1959), *reprinted in* 1 *Leg.Hist.* at 332, and a version requiring the states to apply federal law in cases over which the Board could have asserted jurisdiction but chose not to. S. 1555, 86th Cong., 1st Sess. (1959), *reprinted in* 1 *Leg.Hist.* at 338. Instead, Congress passed a statute, which became § 14(c), that was criticized by its opponents as placing "no limitation whatsoever upon the Board's power to deny employees and employers the protection of the National Labor Relations Act." 105 Cong. Rec. 15,537, 15,542 (address of Sen. Rayburn, read into record by Rep. Thompson), *reprinted in* 2 *Leg.Hist.* at 1574, 1578. See also 105 Cong.Rec. 15,550–51 (1959) (analysis of Rep. Eliot, read into record by Rep. Bolling), *reprinted in* 2 *Leg.Hist.* at 1587;

105 Cong.Rec. 17,877 (1959) (remarks of Sen. Morse), *reprinted in* 2 *Leg.Hist.* at 1421.

In sum, the legislative history shows that in enacting section 14(c), Congress dealt with the "no-man's-land" problem by restoring the status quo ante *Guss,* supra: It expressly permitted the states to regulate labor relations when the NLRB had jurisdiction but declined to assert it, and preserved the Board's discretion to so decline. The language Congress used to describe that discretion, together with the comments of legislators who opposed this approach, strongly suggest that Congress intended also that the Board's exercise of its discretion would ordinarily be unreviewable.[2]

This conclusion is not surprising, given the nature of the decisions the NLRB makes under section 14(c)(1). Congress enacted no specific standards, nor did it require the Board to do so by regulation. The impact of labor disputes on commerce is, of course, the overall guide, but the dollar volume of business in interstate commerce is not the only yardstick that the Board can or should consider. Many other factors can be important. For instance, if the states regulate a given industry adequately, labor disputes in that industry might well be reduced to the point where their impact on commerce would be insignificant, whatever the volume of interstate commerce in the industry. In deciding whether to expend its limited resources to regulate one industry, the Board must inevitably consider the effect this will have on its efforts in other industries that are also involved in commerce. In formulating its policies on particular industries, the Board must look at the situation not just in one state, but na-

---

**2.** The State Board also argues that subsequent legislative history shows that Congress has impliedly approved the NLRB's practice of not asserting jurisdiction over the horse racing industry. The State Board would have us discern this approval in Congress' failure to amend the Act to require assertion of jurisdiction over this industry, despite the fact that it did amend the Act to require coverage of health care institutions. Pub.L. No. 93–360, 88 Stat. 395 (1974). The State Board also considers it significant

that in enacting the Interstate Horseracing Act of 1978, 15 U.S.C. § 3001 et seq., to regulate interstate wagering on horse racing and to prevent states from interfering with each other's regulations, Congress made an express finding that the states should have primary responsibility for regulating wagering within their borders. These arguments, while not without significance, are not necessary to our conclusion that Congress intended to preclude judicial review of the Board's horse racing policy.

tionwide. As the Supreme Court has noted, "where the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms"—in this case, the words "sufficiently substantial to warrant the exercise of [the Board's] jurisdiction"—"the very construction of the statute is a distinct and profound exercise of discretion." *Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958). In short, when the Board decides whether the exercise of its jurisdiction is "warranted," it does far more than just measure the volume of commerce involved, taking jurisdiction over the largest industries and declining jurisdiction over the smallest.[3]

Under section 14(c)(1), the Board must make policy decisions about how best to effectuate the purposes of the national labor laws, decisions informed by its special knowledge and expertise. When it promulgated Rule 103.3 in 1973, the Board properly considered such factors as the extensive state regulation of the horse racing industry, the "unique and special relationship" between the states and the industry, the relative infrequency of labor disputes in the industry, the sporadic and short-term employment, marked by high turnover, and the difficulty thereby posed for effective Board regulation, and the Board's current workload. When the Racing Association petitioned in 1979 for amendment or repeal of the rule, it presented no data suggesting that conditions in the industry as a whole, or even in New York alone, had changed significantly in these respects since 1972–73. The Board therefore relied on its prior analysis in concluding that it should continue to decline to take jurisdiction over the horse racing industry. This is precisely the sort of decision-making that should in the normal course of things be left to the discretion of the agency to which Congress has

entrusted it. This case presents no extraordinary circumstances to justify judicial review despite Congress' clear intention to preclude it—no allegations of racial discrimination are made, see *Wong Wing Hang v. INS,* supra, 360 F.2d at 719, and no colorable claim that the Board ignored a clear statutory mandate or exceeded its jurisdiction is raised, see *Langevin v. Chenango Court,* supra, 447 F.2d at 303. We are thus convinced that the District Court was without jurisdiction to review the substance of the Board's promulgation of Rule 103.3 and its 1979 decision not to repeal or amend it.

■ 2. *Review of the Board's Procedures.* Of course, the district court would still have jurisdiction to review the procedures by which the Board reached its decisions. Indeed, the district judge's statement that "[a]t the time of the original promulgation of 103.3, the Board undertook no adequate factual investigation," and the judge's other suggestions that the Board was required to conduct hearings and make findings of fact imply that he did so. However, the record reveals that both the original promulgation of Rule 103.3 and the 1979 decision were procedurally sound. Section 14(c)(1) expressly provides that decisions to decline jurisdiction may be made "by rule of decision or by published rules adopted pursuant to subchapter II of chapter 5 of Title 5." The Board complied with all of the requirements for agency informal rulemaking set out in the APA, 5 U.S.C. § 553. A proper notice of proposed rulemaking was published in the Federal Register on July 18, 1972, and interested parties were invited to submit written data and views. Responses were received and considered, and a rule was adopted and published along with an explanatory statement. 38 Fed. Reg. 9507, 9537 (1973). The APA does not mandate a hearing unless required by statute, 5 U.S.C. § 553(c), and the Act imposes

---

**3.** Since the enactment of section 14(c), courts have recognized that the NLRB has unreviewable discretion to assert jurisdiction even over cases where the impact on commerce is trivial by the Board's own guidelines. *NLRB v. An-* *thony Co.,* 557 F.2d 692 (9th Cir.1977); *NLRB v. Marinor Inns, Inc.,* 445 F.2d 538 (5th Cir. 1971); *NLRB v. WGOK, Inc.,* 384 F.2d 500 (5th Cir.1967).

no such requirement. See 29 U.S.C. § 156; *California Citizens Band Ass'n v. United States,* 375 F.2d 43, 53–54 (9th Cir.1967). Cf. *Hirsch v. McCulloch,* 303 F.2d 208 (D.C. Cir.1962) (Board may not rely on mere advisory opinions in declining to assert jurisdiction over disputes in horse racing industry, but must follow statutory rulemaking procedure or conduct hearings leading to rule of decision).

The 1979 decision not to amend or repeal the rule was also procedurally sound. The APA provides simply that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e), and the National Board has done so in its rules. 29 C.F.R. §§ 102.124, 102.125. There is no statutory requirement that the Board reopen its rulemaking procedure or hold hearings in response to such a petition. The Board gave full consideration under its rules to the 1979 petitions of the Racing Association and others, and issued a reasoned opinion denying them.

### B. Judicial Review of Representation Proceedings

■ The third and final decision at issue in this case is the Regional Director's denial of the Racing Association's 1980 petition requesting the NLRB to take jurisdiction over it and conduct an investigation and certification of representatives under section 9 of the Act, 29 U.S.C. § 159. The Regional Director based his denial on the Board policy, embodied in Rule 103.3, not to assert jurisdiction over any labor disputes in the horse racing industry. Section 9 sets forth the steps to be followed in processing representation petitions. An employee, a union or an employer can petition the NLRB to order an election within a bargaining unit to determine whether the employees desire union representation. Courts have long recognized that Board actions under section 9 are not subject to judicial review unless an election has been held and the Board has taken the further step of bringing an unfair labor practice proceed-

ing under section 10, 29 U.S.C. § 160, against a dissatisfied and uncooperative party to the section 9 proceedings. *Boire v. Greyhound Corp.,* 376 U.S. 473, 476–77, 84 S.Ct. 894, 896, 11 L.Ed.2d 849 (1964); *Herald Co. v. Vincent,* 392 F.2d 354, 356 (2d Cir.1968); *Teamsters Local 690 v. NLRB,* 375 F.2d 966, 969 (9th Cir.1967); *Lawrence Typographical Union v. McCulloch,* 349 F.2d 704, 706 (D.C.Cir.1965); *National Maritime Union v. NLRB,* 267 F.Supp. 117, 119 (S.D. N.Y.1967). This delay in review is the price Congress has chosen to pay to avoid interrupting progress towards swift administrative solutions to labor problems. *Boire v. Greyhound,* supra, 376 U.S. at 477–78, 84 S.Ct. at 896–97; *Herald Co. v. Vincent,* supra, 392 F.2d at 356; *McLeod v. Local 476, United Brotherhood of Industrial Workers,* 288 F.2d 198, 201 (2d Cir.1961).

The courts have developed several exceptions to this general rule, however. *Herald Co. v. Vincent,* supra, 392 F.2d at 356–57; *Teamsters Local 690 v. NLRB,* supra, 375 F.2d at 969–72; *National Maritime Union v. NLRB,* supra, 267 F.Supp. at 119–20. Only one is relevant to this case: In *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Supreme Court held that the district court had jurisdiction "to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." Id. at 188, 79 S.Ct. at 183. The Court later made clear that this exception is "a narrow one," not to be applied "whenever it can be said that an erroneous assessment of the particular facts before the Board has led it to a conclusion which does not comport with the law." *Boire v. Greyhound Corp.,* supra, 376 U.S. at 481, 84 S.Ct. at 898. See also *Boire v. Miami Herald Publishing Co.,* 343 F.2d 17 (5th Cir.1965); *Local 1545 v. Vincent,* 286 F.2d 127, 132–33 (2d Cir.1960); *National Maritime Union v. NLRB,* supra, 267 F.Supp. at 120–24.

The district court found that sections 9(c)(1) and 14(c)(1) of the Act grant employers like the Racing Association "a statutory

right to representation hearings unless refusal of jurisdiction by the Board is specifically mandated by [section 14(c)(1)]." Despite the use of the word "shall" in section 9(c)(1), which is reproduced in the margin,[4] the section has been interpreted by the courts to afford the Board great latitude in determining whether or not to proceed with a hearing. *National Maritime Union v. NLRB*, supra, 267 F.Supp. at 122. Moreover, as the discussion in Part II.A.2., supra, of the discretionary nature of section 14(c)(1) makes clear, that section, except for the proviso, mandates nothing. It is as far as it can be from the "clear and mandatory" requirement at issue in *Leedom v. Kyne*, supra, 358 U.S. at 188, 79 S.Ct. at 183. In that case, the Board conceded that it had failed to comply with the provision of section 9(b)(1) that "the Board shall not" determine that a unit including both professional and non-professional employees is appropriate for collective bargaining "unless a majority of such professional employees vote for inclusion in such unit." See 358 U.S. at 188–89, 79 S.Ct. at 183–84. Here, by contrast, the Regional Director refused to order a representation hearing in reliance on a Board policy promulgated under a statute granting the Board almost unlimited discretion to take or decline jurisdiction. *Leedom v. Kyne* provides no basis for judicial review of that refusal or of the underlying policy. See *National Maritime Union v. NLRB*, supra, 267 F.Supp. at 121–24.

The District Court also relied on *Office Employees v. NLRB*, supra, *Hotel Employees v. Leedom*, supra and *Hirsch v. McCulloch*, supra, to establish a clear mandate violated by the Board. However, such reliance is misplaced. The last case merely held that in refusing to grant representation hearings, the Board may not rely on a policy of declining jurisdiction under section 14(c)(1) that is based on advisory opinions rather than on properly promulgated rules or decisions after a hearing. As discussed above, Rule 103.3 was promulgated according to proper rulemaking procedures, thus providing a sound basis for the Regional Director's decision. *Office Employees* and *Hotel Employees* would indeed support the district court's assertion of jurisdiction, if Congress had not overruled them by enacting section 14(c). See the discussion of legislative history, in Part II.A.2., supra. See also 105 Cong.Rec. 17,877 (1949) (remarks of Sen. Morse), *reprinted in 2 Leg. Hist.* at 1421.

The Racing Association argues that it is unjust for the district court to have no jurisdiction in this case, because then the NLRB's 1980 representation decision will never be reviewable. In the ordinary case, as already indicated, review is merely delayed until after an election has been held and an unfair labor practice proceeding initiated; here, however, this will obviously never occur, since the Board has refused to act at all. The short answer to this argu-

---

4. Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

> (A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a) of this section, or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a) of this section; or

> (B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a) of this section;

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof. 29 U.S.C. § 159(c)(1).

ment is that "not every governmental action is subject to review by judges." *United States ex rel. Kaloudis v. Shaughnessy*, 180 F.2d 489, 491 (2d Cir.1950) (L. Hand, Ch. J.).[5] The Racing Association is in the same position as any party who seeks an election but is unsuccessful in persuading the Regional Director to order one. See, e.g., *Physicians National House Staff Ass'n v. Fanning*, 642 F.2d 492, 499 (D.C.Cir.1980) (in banc), cert. denied, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). Cf. *United Electrical Contractors Ass'n v. Ordman*, 366 F.2d 776 (2d Cir.1966) (per curiam).[6]

### III. Conclusion

We have considered all of appellee's arguments supporting the district court's assumption of jurisdiction, and they are without merit. The district court had no jurisdiction to review the promulgation of Rule 103.3 in 1973, the NLRB's refusal in 1979 to repeal or amend the rule, or the Regional Director's denial in 1980 of the Racing Association's petition for a representation hearing. We therefore reverse and vacate the order of the district court and remand with instructions to dismiss the complaint.

---

5. We believe that this disposes of the Racing Association's argument made in passing in a footnote in its brief that the lack of review denies it due process.

6. The Racing Association relies heavily upon *Florida Board of Business Regulation v. NLRB*, 686 F.2d 1362 (11th Cir.1982), in which the Eleventh Circuit held that the district court had jurisdiction to rule on the request of a Florida state agency, after the NLRB had ordered rep-

resentation elections, to issue a declaratory judgment that the NLRB "lacked statutory and constitutional authority to regulate labor disputes in the jai alai industry as a whole." Id. at 1369. We respectfully suggest that this case gives far too narrow a reading to the applicability of *Leedom v. Kyne*, supra, as construed by *Boire v. Greyhound Corp.*, supra, 376 U.S. at 481, 84 S.Ct. at 898, to district court review of section 9 proceedings.