The ALAN GUTTMACHER INSTITUTE; Richard Udry, Ph.D.; Larry Bumpass, Ph.D.; Charles F. Westoff, Ph.D.; John G. Kantner, Ph.D.; Ronald Freedman, Ph.D.; Samuel Preston, Ph.D., Plaintiffs,

v.

M. Peter McPHERSON, Administrator of the Agency for International Development (AID) and Director of the International Development Cooperation Agency; Jay Morris, Deputy Administrator for AID; Richard R. Miller, former Chairman of the Communications Review Board for AID, and his successor in office; and Walter Rockwood, Mary Beth Bloomberg, Dee Ann Smith, Kate Semerad, Don Thieme, Doug Trussell, and Beth Hogan, members of the Communications Review Board for AID, and their successors in office; George P. Shultz, Secretary of State; David A. Stockman, Director of the Office of Management and Budget, Defendants.

No. 83 Civ. 4461–CSH.

United States District Court, S.D. New York.

Nov. 27, 1984.

Order Dec. 6, 1984.

**1532**

Suzanne M. Lynn, Janet Benshoof, Nan D. Hunter, Burt Neuborne, American Civ. Liberties Union Foundation, Samuel Whitney Seymour, John L. Hardiman, New York City, Steven R. Shapiro, Arthur Eisenberg, Madeline Kochen, N.Y. Civ. Liberties Union, New York City, for plaintiffs; William Josephson, Fried, Frank, Harris, Shriver & Jacobson, New York City, Lawrence R. Sidman, Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendants; Denny Chin, Asst. U.S. Atty., New York City, Stephen L. Wilson, Atty. Advisor, Office of the Gen. Counsel, Agency for Intern. Development, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

This action challenges the decision of the Agency for International Development ("AID") not to renew a grant which provided funding for publication of *International Family Planning Perspectives* ("*Perspectives*"), a journal published by plaintiff The Alan Guttmacher Institute ("the Institute"). Defendants have moved for judgment on the pleadings pursuant to Rule 12(c), Fed.R.Civ.P., raising individual objections to certain claims and asserting sovereign immunity as a defense to all of the claims.

*Factual Background*

The Institute is a private, non-profit corporation which conducts research and disseminates information on population and family planning. Since 1974, it has published under various titles (currently *International Family Planning Perspectives*) a quarterly journal concerned with research and news in the field of international population control and family planning. Intended for use primarily by professionals, *Perspectives* publishes both original articles and summaries of recent developments culled from other journals in the field.

AID is described by the government as a "semi-autonomous" agency existing within the International Development Cooperation Agency ("IDCA"), which is itself described as an "independent" agency organized within the Department of State. Initial funding for *Perspectives* was provided by an AID grant, and AID continued as a major economic sponsor of the journal until early last year. It was at that time that the grant prior in time to the one at issue here was permitted to expire without renewal.

In April, 1981, the government's Office of Management and Budget ("OMB") issued a directive, Bulletin No. 81–16, intended to spur agencies to pare government expenditures by eliminating unnecessary spending on publications. In order to implement the directive, AID set up a body called the Communications Review Board ("CRB"). In December, 1982, CRB issued a recommendation that *Perspectives'* grant not be renewed. CRB's negative evaluation contradicted a recommendation by the agency's Office of Population that funding be continued. Defendant McPherson, head of both AID and IDCA, apparently accepted CRB's recommendation for in February, 1983, he announced that AID would not renew the *Perspectives* grant. Since that time *Perspectives* has operated on a reduced scale with private funding.

The crucial OMB directive instructed agencies to identify and eliminate "duplicative and wasteful" publications. Apparently OMB had in mind something more than economic waste, however, for a "Model Control Plan" issued to guide implementation of directive suggested that one factor to be used in evaluating the wastefulness of a publication was whether it "reflects agency and Administration goals and priorities." (Attachment A–4, "Model for Agency Control Systems," appended to defendants' Reply Memorandum). CRB undertook the review of *Perspectives* with which we are here concerned in 1982 in order to implement the OMB Bulletin. It is not clear from the complaint exactly how the review was accomplished; allegedly CRB had not established any formal procedures at this time. In any event, CRB recommended termination of the grant in a memorandum dated December 15, 1982. The memorandum purported to base its recommendation on both the alleged economic superfluousness of the journal and on its advocacy of abortion as a family-planning tool. Plaintiffs claim that these reasons are pretextual, intended to disguise the true reasons for the negative rating, which are alleged to have been CRB's desire to suppress *Perspectives'* publication of accurate, neutral information about the use of abortion in a family planning programs, presumably on the theory that neutral information has the effect of promoting its use, and to punish the Institute, *Perspectives'* publisher, "for its research and public education activities in support of reproductive rights." (Complaint, ¶ 31).

CRB's awareness of *Perspectives'* attitude towards abortion was, of course, not entirely hidden; the memorandum accuses *Perspectives* of publishing articles the "thrust" of which "constituted advocacy [of abortion]," a position "inconsistent with administration and AID policy." CRB feared that *Perspectives'* coverage of abortion "may provide a potential and unnecessary embarrassment to the Administrator and AID as well as jeopardizing the integrity of the CRB, its members, and its mandate from OMB." Plaintiffs state that the allegation underlying these perceived concerns—that *Perspectives* advocated abortion—is simply false, as are the representations that *Perspectives* is not economically justified.

*Analysis of the Complaint*

Plaintiffs, the Institute and various professionals who read or write for the journal, instituted this action in order to challenge the AID action. The complaint alleges five causes of action:

*First cause of action:* in terminating funding for *Perspectives* because its publisher espoused ideas in other fora with which the administration disagrees, defendants violated the Institute's First Amendment rights.

*Second cause of action:* in terminating funding for *Perspectives* because it published accurate reportage defendants "engaged in content-based discrimination in violation of the First and Fifth Amendments."

*Third cause of action:* in terminating the funding for *Perspectives* defendants violated the Foreign Assistance Act of 1961 ("FAA"), under which *Perspectives* was funded.

*Fourth cause of action:* in terminating funding for *Perspectives* without a formal hearing and on the basis of improper political pressure, CRB deprived plaintiffs of property without due process of law in violation of the Fifth Amendment.

*Fifth cause of action:* in terminating funding for *Perspectives* defendants acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA").

Plaintiffs request a declaratory judgment that defendants' conduct was unlawful, disqualification of the offending members of CRB from further consideration of the Institute's grant applications, and far-reaching injunctive relief which would reconstitute the CRB and either restore *Perspectives'* funds or secure a lawful review of its application.

Defendants move for judgment on the pleadings, arguing primarily 1) that the

funding decision is committed to agency discretion by law and is thus unreviewable under the APA, 2) that the relief requested is a type of affirmative injunctive relief which is unavailable against the government in the absence of its consent, 3) that the individual plaintiffs lack standing to pursue the action, 4) that a grant recipient has no property right protected by the Fifth Amendment's due process clause and 5) that the action is moot.

### I. *Review Under the APA*

This is an action for review of an administrative decision. Although five causes of action are stated, all require the court to examine in one way or another the lawfulness of the AID's decision not to renew the Institute's grant. The fifth cause of action alleges that defendants acted arbitrarily and capriciously in violation of the APA. Reversing the numerical order of things, I will first deal with defendants' challenge to that cause of action.

■ The question presented by this aspect of the motion is not whether review is available at all but rather on what terms it will be conducted. As the D.C. Circuit has recognized, "[r]eviewability and the scope of review are two separate questions." *National Association of Postal Supervisors v. United States Postal Service,* 602 F.2d 420, 432 (D.C.Cir.1979). It is fundamental to our system of law that the district court always stands ready to insure that governmental—e.g., agency—action has not overstepped constitutional bounds. *See, Crowell v. Benson,* 285 U.S. 22, 64, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932); *Grace Towers Tenants Association v. Grace Housing Development Fund Co.,* 538 F.2d 491, 496 (2d Cir.1976); *WWHT, Inc. v. FCC,* 656 F.2d 807, 815 n. 15 (D.C.Cir.1981). Nor are agencies at liberty to violate clear statutory demands free from the threat of judicial oversight. *Kletschka v. Driver,* 411 F.2d 436, 444 (2d Cir.1969); *Grace Towers, supra,* 538 F.2d at 496; *New York Racing Association, Inc. v. NLRB,* 708 F.2d 46, 54 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983). At this point, however, guaranteed review ends. Courts can always inquire as to whether an agency's reasons for acting were unconstitutional or in clear violation of a statutory mandate; they are not universally free to ask whether those reasons were wise, rational, relevant or supported by the available evidence. The right to this type of review must be secured by statute.

It is this latter "thorough, probing, indepth review," as Justice Marshall termed it in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), which is provided for by the APA. Those aggrieved by an agency decision may invoke APA review unless the decision in question falls within one of two express exceptions: review is expressly prohibited by statute or the decision in question is one "committed to agency discretion by law." 5 U.S.C. §§ 701(a)(1) and (2), 702. The latter provision, however, does not preclude review of all discretionary agency decisions. Congress apparently intended review of agency discretion in some circumstances, for 5 U.S.C. § 706(2)(A) directs courts to set aside agency abuses of discretion.

■ The tension between these two sections has not gone unnoticed. As Judge Friendly has written, the § 701(a)(2) exception, taken literally, threatens to "swallow a much larger portion of the general rule of reviewability than Congress could have intended, particularly in light of 5 U.S.C. § 706(2)(A)...." *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 302 (2d Cir.1971). Of course, the same can be said of § 706(2)(A): taking it literally threatens to eliminate § 701(a)(2) by opening all discretionary exercises of power to review. Courts have struggled to find the balance which Congress presumably intended. The Second Circuit's most recent attempt at blending § 701(a)(2) and § 706(2)(A) resulted in this formulation: "judicial review is the rule, and preclusion under section 701(a)(1) and (2) the exception; but if clear and convincing evidence can be shown that Congress intended to make an agency action unreviewable, then the courts are without jurisdiction." *New York Racing Asso-*

*ciation, supra,* 708 F.2d at 51. Divination of Congressional intent begins with the language of the statute authorizing the agency action. This initial stage of the inquiry focuses on whether the statute is drafted so broadly that there are no standards against which to measure the agency's action or, conversely, whether a detailed statutory scheme plainly permits review. *New York Racing Association, supra,* 708 F.2d at 50–51; *see Overton Park, supra,* 401 U.S. at 410, 91 S.Ct. at 820. If the statute is not either conclusively broad or detailed, a number of other factors bearing on Congressional intent must be examined. *New York Racing Association, supra,* 708 F.2d at 51.

The government contends that the plain language of the FAA and its statutory history demonstrate conclusively that Congress intended to foreclose APA review of AID funding decisions. The paradigm of a statute vesting unreviewable discretion in a government agency arose in *Greater New York Hospital Association v. Mathews,* 536 F.2d 494 (2d Cir.1976), in which the Second Circuit refused to accord APA review to a rule governing timing of Medicare payments. The rule was promulgated under a statute which permitted the agency to pay "at such time or times as the Secretary believes appropriate (but not less often than monthly)." 536 F.2d at 498. The broad language, containing virtually no standards which could govern the exercise of agency discretion, was held to foreclose APA review. In comparison, AID funding for grants related to family planning is distributed under 22 U.S.C. § 2151b(b), which reads:

> (b) *Assistance for voluntary population planning*
>
> In order to increase the opportunities and motivation for family planning and to reduce the rate of population growth, the President is authorized to furnish assistance, on such terms and conditions as he may determine, for voluntary population planning. In addition to the provision of family planning information and services, including also information and services which relate to and support natural family planning methods, and the conduct of directly relevant demographic research, population planning programs shall emphasize motivation for small families.

As the government is quick to point out, the only language which guides the expenditure of funds under this subsection is "on such terms and conditions as [the President] may determine." This is functionally identical to the language in the statute in *Greater New York:* "as the Secretary believes appropriate." If this is the only language guiding the agency's behavior, there is plainly no law to apply. *Greater New York* is controlling.

Plaintiffs, however, point to 22 U.S.C. § 2151b(d), which they argue supplies standards against which AID's exercise of discretion may be reviewed.[1] That section provides:

> (d) *Administration of assistance*
>
> (1) Assistance under this part shall be administered so as to give particular attention to the interrelationship between (A) population growth, and (B) development and overall improvement in living standards in developing countries, and to the impact of all programs, projects, and activities on population growth. All appropriate activities proposed for financing under this part shall be designed to build motivation for smaller families through modification of economic and social conditions supportive of the desire for large families, in programs such as

---

**1.** Plaintiffs also cite certain AID regulations as law which would provide a basis for review. *See* 41 C.F.R. § 7–7.5003–3(b)(1)(v) (1983). Assuming for now that regulations of any sort could be probative of the issue at hand, Congressional intent, I nevertheless find these particular regulations irrelevant. They are not regulations meant to interpret § 2151b. Rather, they state the text of various standard clauses which AID inserts in its contracts with organizations like the Institute. *See* 41 C.F.R. § 7–7.5000 (1983). Although the clause which plaintiffs cite was clearly inspired by 22 U.S.C. § 2151b(f)(3), its statement in a regulation does not constitute the type of interpretive rule which could arguably be used to measure an agency exercise of discretion.

education in and out of school, nutrition, disease control, maternal and child health services, improvements in the status and employment of women, agricultural production, rural development, and assistance to the urban poor, and through community-based development programs which give recognition to people motivated to limit the size of their families. Population planning programs shall be coordinated with other programs aimed at reducing the infant mortality rate, providing better nutrition for pregnant women and infants, and raising the standard of living of the poor....

(3) Assistance provided under this section shall emphasize low-cost integrated delivery systems for health, nutrition, and family planning for the poorest people, with particular attention to the needs of mothers and young children, using paramedical and auxiliary medical personnel, clinics and health posts, commercial distribution systems, and other modes of community outreach.

Plaintiffs also cite 22 U.S.C. § 2151b(f)(1) and (3), which specifically prohibit the use of § 2151b(b) funds to pay for abortions or biomedical research about them.

Both of these provisions rein in the agency's discretion somewhat. Section 2151b(f), however, is functionally equivalent to the proviso in the *Greater New York* statute, "(but not less often than monthly)." By so clearly closing off one small avenue of expenditure, it does little to narrow the universe of funding options open to AID. Section 2151b(d) does provide more useful guidance. Yet its presence does not counter the rather convincing committal to agency discretion represented by the grant of power to the President to spend "as he may determine."

 The provision might, perhaps, permit a court to decide whether a project was particularly inappropriate for funding, for it lists various goals which funded projects must be designed to serve. Projects plainly antithetical to those goals could, in theory, be judicially weeded out. The subsection does not, however, give courts any

guidance in sorting among the many projects consistent with the goals stated. It provides no basis for review. A comparison with *Overton Park, supra,* is instructive here. In *Overton Park,* the Supreme Court considered an Interior Department ruling under a statute which forbade the routing of highways through public parkland unless no other "feasible and prudent" alternative route existed. The Court held that there was "law to apply," 401 U.S. at 410, since "the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems." 401 U.S. at 413, 91 S.Ct. at 822. Any agency decision can readily be measured against this type of standard. Once a park-disrupting route is approved, a court can examine the various available alternative routes to insure that all present "unique problems." No such clear standard presents itself here. A finding that *Perspectives* satisfies the criteria of § 2151b(d) indicates only that it is a proper candidate for funding under § 2151b(b). It gives the reviewing court no clue as to whether it is a desirable candidate, and thus whether failure to fund it was an abuse of discretion. In making this further review, there are no guidelines. There is no law to apply.

The impression that Congress could not have intended review is reinforced by an examination of the type of action which plaintiffs seek to have reviewed. When Congress's committal of action to agency discretion is not so unrestrained nor so detailed as to make its intent regarding APA review obvious, courts must further consider "the nature of the agency action involved, the amount of expertise required, the place of the particular action and of judicial review in the overall statutory scheme governing the agency and, of course, the legislative history of the statute." *New York Racing Ass'n., supra,* 708 F.2d at 51. The Institute seeks review of an agency's determination not to renew its grant of funding. Such determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate

the wisest dissemination of an agency's limited budget. Although it was .decided before the watershed decision in *Overton Park*, *Kletschka v. Driver*, 411 F.2d 436 (2d Cir.1969) is illuminating in this connection. The plaintiff in *Kletschka*, a Veteran's Administration employee, sued for review of an Administration decision refusing to restore his research grant and transferring him to a distant hospital. The decision was allegedly motivated by the vindictiveness of plaintiff's superiors. In refusing APA review, Judge Lumbard noted:

> It would not be feasible for the courts to review decisions by the V.A. awarding or refusing to award research grants. Each such decision involves a determination by the agency with respect to the relative merits of the many proposed research projects for which funds are sought. This determination requires considerable expertise in the scientific, medical, and technical aspects of each application. A reviewing court would have to master considerable technical data before it could even attempt to determine whether one application, Dr. Kletschka's for example, was so superior to the others that its rejection by the V.A. was an abuse of discretion. Furthermore, even if these technical aspects were mastered it would be difficult for the court to review the judgments of relative personal competence which necessarily play a role in the agency determination.

411 F.2d at 443.

Such a review would be even more difficult in this case. *Perspectives* was pre-sumably competing for funds not only against other . publications but against a myriad of other population control projects, all designed to serve different aspects of the many objectives listed in § 2151b(d). It would be virtually impossible for a court to make a determination that *Perspectives* served such an important role in population control that "its rejection by [AID] was an abuse of discretion," involving as it would weighing not only the relative merits of publications but also the relative importance of far less commensurable potential objects of family planning aid. Congress cannot have intended so complex an exercise of discretion to be subject to judicial review.[2]

I conclude not only that the broad statutory language itself but also the nature of the act to be reviewed, in particular its inappropriateness for judicial review, indicate Congressional intent to preclude APA review of funding decisions under § 2151b(b). Plaintiffs' request for such review is dismissed.[3]

## II. *Sovereign Immunity*

I now come to a defense challenge of more broad application.

Plaintiffs request extensive injunctive relief, including an order directing that the CRB be reconstituted and made to reconsider the *Perspectives* grant request. The government raises in defense the doctrine of sovereign immunity, which bars suits

---

**2.** The government has also presented an extensive discussion of the statutory history of the FAA designed further to demonstrate the intent of Congress not to subject AID funding decisions to judicial review. I find the language and nature of the statute persuasive enough on the issue of Congressional intent that recounting of the history would be superfluous. Suffice to say that the history so thoroughly laid out by the defendants gives no hint that these decisions were intended to be reviewable.

Nor do I find it necessary to reach the question of whether this agency decision is covered by the general rule that matters involving foreign affairs are entrusted to State Department discretion. *See, e.g., Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Plainly this doctrine would not bar review of claims that an agency has acted unlawfully or unconstitutionally (*see* note 3, *infra*). *Pan American World Airways, Inc. v. CAB*, 380 F.2d 770, 775–776 (2d Cir.1967), *aff'd.*, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968).

**3.** In its reply the government acknowledges that claims that an agency action is unlawful or unconstitutional may be entertained by the district court regardless of the APA. Because defendants do not challenge in their motion the facial validity of plaintiffs' assertion of these causes of action, I do not address plaintiffs' defense of them at pages 3 through 5 of their memorandum in opposition.

against the federal government[4] to which it has not consented.

■ While consent is ordinarily a prerequisite to suit against the sovereign, that is not so where a plaintiff alleges that government officers exceeded their statutory powers or acted contrary to the Constitution. The Supreme Court so held in *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 689–690, 69 S.Ct. 1457, 1461–62, 93 L.Ed. 1628 (1949).

In the case at bar, plaintiff Institute makes constitutional claims. They arise under the First and Fifth Amendments. The Fifth Amendment claim, asserting a property interest in the grant, is considered under Point IV, *infra* and dismissed for lack of merit. The First Amendment claim is not subject to summary dismissal; but the doctrine of sovereign immunity arguably impacts upon the available relief, assuming the claim is well founded.

The Institute's First Amendment claim is not pleaded with specificity, to put it mildly. The complaint, ¶ 36, pleads in conclusory fashion:

"In seeking to terminate funding of *Perspectives* because its publisher had engaged in speech in other fora with which defendants disagreed, defendants violated plaintiffs' rights under the First Amendment to the United States Constitution."

The prior factual allegations give scant support for the conclusion. The only pertinent allegation appears in ¶ 31, which reads in full:

"Upon information and belief, the CRB's negative recommendation was designed, first, to prevent publication of accurate information concerning the incidence, extent or consequences of abortion because, in the view of defendants, such information does not advance 'Administration goals and priorities', and, second, to punish *Perspectives'* publisher, The Alan Guttmacher Institute, for its research and public education activities in support of reproductive rights."

The second of these two alleged motives for the adverse finding action may be read—it is far from clear—as a reference to the Institute's *unrelated* activities "in support of reproductive rights," by which plaintiff presumably includes abortion. The theory, in short, is that AID withheld the grant because defendants were offended by plaintiff's unspecified activities in other, unspecified "fora."

Thus read, the complaint would appear to be a First Amendment claim, at least on behalf of the Institute. (The individual plaintiffs lack standing; see Point V, *infra*.) Defendants do not suggest otherwise; they wrote in their reply brief at 14:

"Plaintiffs have attempted to raise a number of claims, but only one should be heard by this Court: whether AID violated Guttmacher's constitutional rights by deciding not to renew funding because of Guttmacher's exercise of constitutionally protected activity."[5]

Sovereign immunity complicates not the right to assert such a claim, but the permis-

---

**4.** Although the United States is not a party to this action, plaintiffs do not contest that this action is for all practical purposes against the government. *See Dugan v. Rank*, 372 U.S. 609, 620–621, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1963).

**5.** Although defendants acknowledge the facial validity of only the First Amendment claim, they failed in their briefs to challenge the legitimacy of two claims: the First Amendment claim and the statutory claim which is denominated "Third Cause of Action" at page 6 of this opinion. As I read it, this cause of action alleges that defendants terminated funding for *Perspectives* because it published neutral, wholly factual information about the use of abortion and that the FAA forbids administrators to discriminate among publications on this basis. Whether defendants overlooked this claim or are under the mistaken impression that they have presented arguments against it I do not know. I have scoured their briefs, however, and have found no direct challenge to its facial validity. Therefore I make no present ruling regarding it.

The relief requested under this cause of action is identical to that requested under the First Amendment claim. Although this section specifically refers only to relief for the First Amendment claim, all comments made concerning this relief are equally applicable to the relief available under this third cause of action.

sible scope of judicial relief if the claim is proved. In addition to declaratory relief, plaintiffs seek the following injunctive relief:

"A permanent injunction ordering defendant McPherson to reconstitute the CRB according to law, and to appoint new members to the CRB who will judge fairly AGI's future applications for funding, and (a) ordering defendant McPherson to approve AGI's application for the renewal of its grant for 1983–84, or in the alternative, (b) ordering the CRB to conduct a new review of AGI's 1983–84 application for funding in accordance with law, and (c) ordering defendant McPherson to ensure that future funding applications made by AGI not be prejudiced and be accorded the status of applications for grant renewals; (d) ordering defendant Shultz to ensure that procedures and guidelines for the operation of the CRB which are in accordance with law are established, and (e) ordering defendant Stockman to issue clarification that Bulletin No. 81–16 does not authorize content based review; . . . ."

Remedy is at issue because the Supreme Court in *Larson, supra,* excepted from its general principles suits requesting relief which would require affirmative governmental action, as opposed to mere cessation of unlawful conducts, stating that such an action "may fail, as one against the sovereign." 337 U.S. 691 n. 11, 69 S.Ct. 1462 n. 11. Although it has caused some controversy, footnote 11 of *Larson* has never been explicitly overruled by the Supreme Court. Defendants insist that it now bars at least certain aspects of this action.

I use the qualifying phrase advisedly because it appears that the *Larson* footnote, even if applicable, would not bar the suit altogether. *Larson* is generally held only to make unavailable certain types of relief, not to justify dismissal of actions which, as this one does, contain requests for relief which do not run afoul of sovereign immunity. *U.S. v. Various Articles of Obscene Merchandise,* 514 F.Supp. 463, 470 (S.D.N. Y.1981); *Doe v. U.S. Civil Service Com-*

*mission,* 483 F.Supp. 539, 561 n. 18 (S.D.N. Y.1980). Plaintiffs request declaratory in addition to injunctive relief; the former is permitted under *Larson*. Thus the government's objection is at most a ground for dismissal of the more ambitious requests for injunctive relief.

But plaintiffs assert that sovereign immunity has no proper office at all to perform in the case at bar. They counter the assertion of sovereign immunity with two arguments. First, they argue that 5 U.S.C. § 702, which waives sovereign immunity for suits brought under APA, is applicable here. Second, they argue that in light of post-1949 authority *Larson* is no longer good law.

 Section 702 states that a suit challenging agency action as unlawful "shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . ." This was intended to, and did, effect a waiver of sovereign immunity for suits brought under APA. *B.K. Instrument v. United States,* 715 F.2d 713, 724 (2d Cir.1983). Although the legislative history of the amendment to APA which added § 702 states that its purpose is "to remove the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review," H.R.Rep. No. 1656, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin.News 6121, 6121, the language of 5 U.S.C. § 701 makes § 702 applicable only to those suits for review brought under APA. Section 701 states that "[t]his chapter applies . . ., except to the extent that— . . . (2) agency action is committed to agency discretion by law." Section 702 is part of the chapter of Title 5 to which § 701 refers. As discussed under Point I *supra,* this agency action is "committed to agency discretion by law." Therefore, § 702 does not apply to it and cannot be relied upon by plaintiffs as a waiver of sovereign immunity.

This brings us to the current status of the *Larson* footnote. The *Larson* decision spent little time explaining its exception of suits challenging illegal or unconstitutional

conduct by federal officials from the doctrine of sovereign immunity. The exception is clearly premised, however, upon the legal fiction that once federal agents begin to act unlawfully in the course of their official duties they are no longer acting in their role as representatives of the sovereign. The "sovereign" acts only when its officials act lawfully on its behalf. Viewed from the perspective of the fiction, suits which challenge unlawful or unconstitutional conduct of government officials and request only a cessation of the offensive behavior seek nothing from the sovereign. The cessation of an official's unlawful behavior restores the official to a state of grace with the sovereign and her laws. Granting the requested relief will affect neither government property nor the lawful behavior of governmental officials; only "non-sovereign,"—i.e., unlawful— government activity is affected. But this fiction cannot readily accommodate lawsuits which seek to cause federal officials to act rather than stop acting, for the officials when taking the directed actions would be acting lawfully, and thus in their roles as agents of the sovereign. The sovereign not having consented to such direction, the doctrine of immunity bars it.

By rigorously adhering to the logical dictates of the fiction in *Larson,* the Supreme Court implicitly held that individuals who are harmed by unlawful governmental activity are assured no more remedy than that the activity will not happen again. While this is some comfort, it runs counter to the traditional common law notion that remedies for unlawful conduct should be designed to make its victims whole. For that reason, it is not surprising that courts have chafed under the limits established by *Larson's* eleventh footnote. Taking advantage of the perceived permissive language of the footnote—lawsuits *"may* fail"—the Ninth Circuit has elected to ignore the limit altogether, at least so long the affirmative relief requested would not impose an "intolerable burden" on the government's functioning. *State of Washington v. Udall,* 417 F.2d 1310, 1318 (9th Cir.1969). The Fifth and Seventh Circuits have fol-

lowed the Ninth. *Schlafly v. Volpe,* 495 F.2d 273, 280 (7th Cir.1974); *Clark v. United States,* 691 F.2d 837, 840 (7th Cir.1982); *Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1037 (5th Cir.1974). *See also Marcello v. Regan,* 574 F.Supp. 586, 595 (D.R.I.1983).

Whatever constructions other circuits may have placed upon the *Larson* footnote, Second Circuit authority is of course binding on me. That leads to a consideration of Judge Friendly's opinion in *Knight v. State of New York,* 443 F.2d 415, 419–420 (2d Cir.1971).

The plaintiff in *Knight* owned a section of land appropriated by the State for the purpose of building a highway. Under the applicable statute, title to the land vested in the State immediately upon the State's filing a description of the property with the clerk of the county in which the land was situated. A pre-appropriation hearing was neither required by the statute nor actually held, although plaintiff apparently had a post-appropriation remedy in state court under a different statute. Rather than invoking that remedy, plaintiff chose instead to sue the State in federal court, alleging a taking without due process, and seeking the affirmative relief of setting aside all or part of the appropriation.

Judge Friendly's opinion for the Second Circuit initially upheld dismissal of the action on Eleventh Amendment grounds. 443 F.2d at 419. Judge Friendly's opinion reaches the sovereign immunity question only in considering whether leave should have been granted to amend the complaint so that the suit might proceed against the commissioner of transportation, thereby avoiding the Eleventh Amendment obstacle. That question the court answered in the negative, on the authority of the *Larson* footnote. Judge Friendly observed that "many regard" *Larson* as an "unfortunate opinion"; and that its footnote "has become the subject of microscopic scholarly scrutiny" and ever "broader assaults" of criticism. 443 F.2d at 420. Notwithstanding that criticism, the *Knight* opinion continues, the Supreme Court "has not shown

itself disposed to narrow *Larson.*" *Ibid.* Judge Friendly then analyzes a number of subsequent Supreme Court cases, which in his view "may suggest that *Larson's* footnote 11 was deemed controlling." *Id.* at 421. It is then said in *Knight:*

> In any event, whether or not the Court could qualify note 11 without having to overrule any of these cases, the task of doing so, whether as regards suits against the United States or those encountering the bar of the Eleventh Amendment, is better left to the only body that can speak with authority. We find this course particularly attractive when, as has already been demonstrated and will further appear below, plaintiff has an adequate remedy in the New York courts and a decision by us, only dubiously valid, sustaining federal jurisdiction over a suit against New York officials would open the way for a host of actions on a subject where the knowledge of local conditions possessed by state courts may be peculiarly important.

*Ibid.* At the end of its opinion in *Knight,* the Second Circuit rejected the plaintiff's appeal to state law authorities which arguably could "be taken as expressing a less extensive notion of sovereign immunity than the Supreme Court has recognized for federal courts in the *Larson* footnote ...." *Id.* at 422.

▆ I read *Knight* as holding that, at least until the Supreme Court clarifies the matter, *Larson's* footnote 11 requires the application of sovereign immunity if the requested relief requires affirmative action by the sovereign. To be sure, Judge Friendly regarded that course as "particularly attractive" where a plaintiff has an adequate alternative remedy in state courts; but I do not read *Knight* as requiring the existence of such a remedy before sovereign immunity becomes applicable.

That interpretation of *Knight* is consistent with the Second Circuit's prior decision in *Berk v. Laird,* 429 F.2d 302 (2d Cir. 1970), *cert. denied sub nom. Orlando v. Laird,* 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971). A private soldier, ordered to

report to Vietnam, sought judgment declaring that his superiors were without authority to issue such orders, and a permanent injunction forbidding them to do so. Addressing the jurisdictional question, the Second Circuit said in part through Judge Anderson:

> "Sovereign immunity is no bar to this action, since the complaint alleges that agents of the Government have exceeded their constitutional authority while purporting to act in the name of the sovereign. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689–691, 69 S.Ct. 1457, 1461–62, 93 L.Ed. 1628 (1949). The requested relief does not require affirmative governmental action, but only that the agent involved cease certain allegedly improper conduct. *Id.* at 691, n. 11, 69 S.Ct. 1457; cf. *State of Washington v. Udall,* 417 F.2d 1310, 1317–1318 (9 Cir.1969)." 429 F.2d at 306.

Note that no alternative remedy was available to the plaintiff in *Berk;* and Judge Anderson's opinion specifically cited, with the reference "cf.," to *State of Washington v. Udall,* where as noted *supra* the Ninth Circuit, influenced by the scholarly criticism of *Larson,* interpreted its footnote 11 so as to permit the direction of affirmative governmental action, notwithstanding sovereign immunity. *Berk* seems to stress, clearly enough, that the rules in the Second and Ninth Circuits are different.

There are contrary indications in *Smith v. Lehman,* 689 F.2d 342, 345 (2d Cir.1982), *cert. denied,* 459 U.S. 1173, 103 S.Ct. 820, 74 L.Ed.2d 1018 (1983). Smith was a civilian employee of the Naval Investigative Service. Following termination of his employment, Smith filed suit in the Eastern District of New York alleging a violation of constitutional rights, and arbitrary and capricious action in violation of the APA. He sought reinstatement, money damages, and back pay. Notwithstanding Smith's demand for affirmative action, District Judge McLaughlin rejected the government's sovereign immunity argument. He rejected Smith's claim on the merits. Affirming,

the Second Circuit indicated agreement with the sovereign immunity point:

"We are also inclined to accept the district court's conclusion that Smith's constitutional claims are not barred by the doctrine of sovereign immunity, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1948), even where the success of Smith's claims would require affirmative action on the part of the government. This difficult sovereign immunity question need not be decided, however, because Smith's constitutional claims cannot succeed on the merits." 689 F.2d at 345.

Footnote 7 in the Second Circuit's opinion reads as follows:

"Judge McLaughlin's view that sovereign immunity does not apply in cases of alleged constitutional violations even where the sovereign is called upon to take affirmative action was proper. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 93 n. 5, 96 S.Ct. 1895, 1900 n. 5, 48 L.Ed.2d 495 (1975)."

The quoted passage from *Smith v. Lehman* is useful to plaintiffs because it states, clearly enough, that sovereign immunity does not bar affirmative injunctive relief in actions alleging a constitutional violation. However, the pronouncement is self-proclaimed dictum. Even if *Smith's* discussion of sovereign immunity took the form of a holding, it would then appear to overrule *Knight, supra,* which the *Smith* panel did not even mention. Ordinarily a single panel of the Second Circuit does not overrule the ruling of a prior panel without first consulting the whole court. *See, B.K. Instrument, supra,* 715 F.2d at 717. If after such a consultation the court refuses an *en banc* hearing, the earlier decision controls. *Furman v. Cirrito,* 741 F.2d 524, 525 (2d Cir.1984).

Furthermore, the *Smith* panel, while failing to cite either *Knight* or *Berk,* finds authority for a direction of affirmative action (as did Judge McLaughlin) in *Hampton v. Mow Sun Wong,* 426 U.S. 88, 93 n. 5, 96 S.Ct. 1895, 1900 n. 5 (1975). With due

deference, I do not see how the cited footnote in *Hampton* is instructive on the issue at hand. It does no more than note the district court's ruling that sovereign immunity had been waived in the circumstances of the case. The Supreme Court granted certiorari in *Hampton* to consider the constitutionality of a United States Civil Service Commission regulation barring resident aliens from federal civil service employment. The Court concluded that the regulation was unconstitutional. *Hampton,* a 5–4 decision, nowhere discusses the question of sovereign immunity as a bar to suit for affirmative injunctive relief. The district court's decision in *Hampton* indicates that plaintiffs sought no more than cessation of unconstitutional activity, specifically the enforcement of an allegedly unconstitutional policy. *Mow Sun Wong v. Hampton,* 333 F.Supp. 527, 529 (N.D.Cal. 1971), *rev'd,* 500 F.2d 1031 (9th Cir.1974), *aff'd,* 426 U.S. 88, 96 S.Ct. 1895 (1975). Such relief fits comfortably within *Larson.*

 I conclude that the law of the Second Circuit is declared in *Knight* and *Berk*; and that the law of this circuit, in its interpretation of footnote 11 in *Larson,* applies the doctrine of sovereign immunity so as to foreclose affirmative injunctive relief in the case at bar.

### III. *Tucker Act*

As an alternative to injunctive relief, plaintiffs have requested that the Court enter an order directing that the *Perspectives* grant request be approved. The government argues in its reply brief that because of this request for relief the action must be brought in the Claims Court since, under the Tucker Act, only that court has jurisdiction to hear actions against the United States for a money judgment in excess of $10,000.

The jurisdiction of the district courts and the Claims Court over actions against the United States asking damages under $10,-000 is concurrent, but the Claims Court has exclusive jurisdiction over actions whose claims exceed that amount. 28 U.S.C. §§ 1346(a)(2), 1491. It has been held that

actions which are in effect suits for a money judgment over $10,000 may not evade the Claims Court by being framed as suits for equitable relief. *See, e.g., Clark v. United States,* 596 F.2d 252, 253 (7th Cir. 1979); *Polos v. United States,* 556 F.2d 903, 905 (8th Cir.1977). The government contends that "[n]o matter how [plaintiffs] may seek to characterize their complaint ... it is clear that they are suing principally for a grant in excess of $10,000." Reply brief, at 5. As a consequence, it argues, the case must be dismissed.

■ I cannot agree. It has long been recognized that not all actions alleging wrongful acts by federal officials involving amounts over $10,000 must be brought in the Claims Court, a principle the Second Circuit has recently reaffirmed. *B.K. Instruments, supra,* 715 F.2d at 727. The reluctance to commit all such actions to the Claims Court derives in part from its limited equitable powers. Only "where the primary objective of the plaintiff is to obtain money from the Government" is an action committed exclusively to the Claims Court. *Id.*

In *B.K. Instrument,* plaintiff sought to prevent an agency from awarding a contract before properly considering plaintiff's own bid. The plaintiffs' primary objective in this action is the unbiased and lawful consideration of their request for money. As did the plaintiff in *B.K. Instrument,* they ultimately seek money, but they appear willing to pursue that money through administrative procedures so long as those procedures are lawful. What they seek from the Court is assurance that they will be.

■ Examination of those actions cited above which were declared solely within the jurisdiction of the Claims Court demonstrates that those plaintiffs were seeking only a declaration of their absolute right to a money judgment—in effect, they were seeking an award of money. In this action, by contrast, as in *B.K. Instrument,* plaintiffs acknowledge that they have no absolute right to money. They do not seek a declaration from the Court that they are

entitled to the grant. They seek only to prevent their request for money from being improperly considered by the agency. Their request to have the grant directly awarded is clearly a stop-gap, intended for use by the Court only if fair and lawful consideration of the funding request proves impossible to secure. For these reasons, the Tucker Act does not divest the district court of jurisdiction.

### IV. *Due Process*

■ Plaintiffs claim that they have a property interest in *Perspectives'* continued funding and that procedural improprieties in the consideration of their grant proposal —specifically, the lack of formal procedural guidelines, CRB prejudice, and improper intervention by two Congressmen—deprived them of this interest without due process of law. Defendants move to dismiss this claim, arguing that the Institute had no property interest which the Fifth Amendment protects.

The seminal case is *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Roth* a non-tenured university professor's one-year appointment was not renewed. Prior to the rendering of the decision not to renew no hearing was held to evaluate his performance, and he was given no reasons for the decision. He claimed a property interest in his job which could not be taken without due process. The Supreme Court held that whether the professor possessed a property interest in renewal of his contract which implicated the Fifth Amendment depended upon the nature of the interest created by the terms which governed renewal of his contract. In order to create a property interest, the terms must create a "legitimate claim of entitlement" to continued employment. That the teacher had a "unilateral expectation" of it was held irrelevant. 408 U.S. 577–578, 92 S.Ct. 2709.

The university rules governing renewal of the contract granted no right to a hearing or a statement of reasons for non-renewal, nor did they specify conditions un-

der which a teacher would or would not be kept on. They merely set a date by which time the teacher was to be informed of the university's decision. The contract itself specifically set its term at one year. The Court found that neither the terms of the plaintiff's contract nor the rules governing re-appointment created a "legitimate claim" to re-employment, for they "secured absolutely no interest in re-employment." 408 U.S. at 578, 92 S.Ct. at 2709. This was held true despite the fact that most one-year teachers at the university were granted renewal of their contracts. 408 U.S. at 578 n. 16, 92 S.Ct. at 2710 n. 16.

The Institute was in a very similar situation. *Perspectives* annually applied for one-year grants of funding. So far as appears from the complaint there was never a waiver of the requirement that it reapply every year nor any understanding that the application process was *pro forma.* So far as appears, the applications were considered annually, and if they were deemed by AID to merit funding, given AID's budget and priorities, they were funded. As discussed above, there were no rules which effectively limited AID's discretion and dictated awarding of funds. There were no set standards which *Perspectives* could satisfy which would *require* that it be funded, that is, that would create an entitlement to funding. Undoubtedly the continued annual re-funding of *Perspectives* created an expectation of continued funding, but such expectations cannot automatically be converted to "legitimate claims." Plaintiffs must point to some rules or statutes which distinguish their situation from the ordinary grant application process by creating a "claim" to funding.[6]

Recognizing this, plaintiffs cite 22 U.S.C. §'2151u(a). Section 2151u(a) is the statement of a Congressional finding that "private and voluntary organizations" have an important role to play in foreign develop-

ment activities. The finding "urges" AID's Administrator to draw on the resources of such groups in implementing foreign assistance activities. Pursuant to this finding, Congress required the President to "seek to channel" sixteen percent of the funds appropriated for § 2151a activities to such organizations. 22 U.S.C. § 2151u(f). Plaintiffs argue that their status as a private organization entitled them to a share of § 2151a funds under § 2151u(f).

Plaintiffs analogize their situation to that of the plaintiffs in *Northern California Power Agency v. Morton,* 396 F.Supp. 1187 (D.D.C.1975), *aff'd. mem.,* 539 F.2d 243 (D.C.Cir.1976), and I agree that the comparison is instructive. The plaintiff Power Agency represented a group of municipal utilities which were contesting a rate increase instituted by a federal electrical power-generating facility. By statute, these utilities were "preferred" customers of the facility, 43 U.S.C. § 485h(c), which I take to mean that if any power was generated the utilities got first shot at it. The government conceded that this constituted a property interest. 396 F.Supp. at 1192. There are similarities with this case. Private organizations and public utilities both are members of classes which have a claim on public resources under the respective statutes. The differences, however, are more significant. All utilities were entitled to share in the power, presumably with no claim paramount to another. Their status as public utilities alone qualified them for it. By contrast, it cannot be argued that all private organizations can claim FAA funds. Certain funds are set aside for such groups, but they must still submit grants to receive a share of that money and have no right to a share unless their grant is approved. The class of private organizations is entitled to money; individual private organizations are entitled to nothing except the opportunity to apply for it. On

**6.** As the government notes, applicants for federal grants have consistently been denied due process protection by the courts. *See Pueblo Neighborhood Health Centers, Inc. v. United States Department of Health and Human Services,* 720 F.2d 622, 625 (10th Cir.1983); *Missouri Health & Medical Organization, Inc. v. United States,* 641 F.2d 870, 875 (Ct.Cl.1981); *National Consumer Information Center v. Gallegos,* 549 F.2d 822, 828 (D.C.Cir.1977).

this individual level, the Institute cannot demonstrate a property interest. It has no "claim" on any FAA funds. This cause of action must be dismissed.

### V. *Standing*

In addition to the Institute several individuals have signed on as plaintiffs. Each of the individuals used *Perspectives* in his professional life as a source of information and/or an outlet for research results. Defendants move to dismiss their claims, arguing that they lack standing to assert any claims against the government.

Federal standing requires a plaintiff to demonstrate a palpable injury which can be causally traced to the challenged action. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 90 L.Ed.2d 700 (1982). Plaintiffs list three types of injury: 1) a loss of access to information in *Perspectives,* 2) the loss of a forum, *Perspectives,* in which to speak, and 3) a "chilling effect" on their speech concerning abortions. All are alleged to be injuries to First Amendment rights. The first two can be quickly disposed of. Plaintiffs have no enforceable right to subsidization of their access to and for speech. *See Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 2003, 76 L.Ed.2d 129 (1983). AID has taken no steps affirmatively to restrict the circulation of *Perspectives.* The journal, as a matter of fact, continues to be published. AID simply stopped subsidizing *Perspectives,* an action which, while it may have caused plaintiffs harm by making *Perspectives* less accessible, could not have infringed any protected First Amendment rights of the individual plaintiffs.

Courts have, of course, protected individuals from governmental actions directed at them which would tend to "chill," although not directly prohibit, their protected speech. Plaintiffs properly cite *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) and *Aebisher v. Ryan,* 622 F.2d 651 (2d Cir.1980) as examples of such protection. It has never been held, however, that individuals have a right to be free from governmental action directed against others which tend to chill their, the individuals', speech. To so hold would open to challenge a quantity of governmental activity limited only by the imagination and sensitivities of potential plaintiffs. The First Amendment does not extend so far.

The individual plaintiffs have shown no "chilling" activity directed at them. They have no protectible interests which have been injured by the government's actions. Their claims are dismissed.

### VI. *Claims Against Shultz and Stockman*

Plaintiffs have joined as defendants George Shultz, United States Secretary of State and thus head of the executive department within which AID is organized, and David Stockman, head of the Office of Management and Budget and author of the bulletin which created the CRB. The government moves to have the claims against these two individuals dismissed.

Secretary Shultz is accused of no affirmative misconduct. Instead, it is alleged that as head of the State Department he should have supervised the activities within AID and IDCA more closely to insure that the misconduct which is alleged did not occur. The government's argument for dismissal of the claims against him has two prongs: 1) that under a 1979 Executive Order, No. 12163, Fed.Reg. 56673 (Oct. 2, 1979), the Secretary's authority over the aspects of the AID activity at issue here was removed and vested in the head of IDCA, so that authority ran directly from the President to IDCA, and 2) that in any event the Secretary's presence is unnecessary to the rendering of satisfactory relief to the Institute. The plaintiffs respond to these arguments by pointing out that the Reorganization Act of 1977, 5 U.S.C. §§ 901 *et seq.*, under which Executive Order No. 12163 was promulgated, is of "doubtful" constitutionality because it contains the type of one-house legislative veto struck down in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

Since filing of the briefs the Second Circuit has confirmed the doubtfulness of the 1977 Act's constitutionality by striking it down under *Chadha.* *EEOC v. CBS, Inc.,* 743 F.2d 969 (2d Cir.1984). It thus appears in retrospect that the transfer of the lines of authority away from the Secretary of State to run directly from IDCA to the President was an unconstitutional act, at least in our circuit.

This does not answer the government's argument, however. Plaintiffs must ordinarily assert a valid cause of action against a defendant in order to support his presence in a lawsuit. The Institute has charged that defendant Shultz failed to supervise AID so as to prevent the alleged misconduct. The government has demonstrated that at the time these actions occurred the Secretary was operating under a good faith belief that he had no authority to exercise in regard to these matters. Since under a standing Executive Order he was divested of authority, any attempts at supervision would have been at best disruptive and improper. Thus, his failure to supervise was not a wrongful act. No other cause of action is asserted against him; the claims against him are dismissed.[7]

 A similar problem arises in regard to David Stockman. Plaintiffs seek an order requiring him to "clarify the meaning and effect of OMB Bulletin No. 81–16," which caused CRB to be formed. Of course, their desire for such an order must go unrequited unless defendant Stockman has done something wrong which justifies assertion of a cause of action against him. The Court can render relief only to enjoin wrongful conduct. The government notes that all Stockman is alleged to have done is issue the Bulletin, which it contends was innocent behavior.

Plaintiffs charge that CRB's action in using a review which purported to be directed at eliminating wasteful publications for purposes of defunding publications which published articles which offend administration sensibilities was unlawful and unconstitutional. The government has not yet challenged this claim. This activity was plainly not just inspired but expressly authorized by Stockman's bulletin. If this bulletin authorized—arguably compelled—activity found to be unlawful, plaintiffs are entitled to its nullification. Defendant Stockman will remain.

## VII. *Mootness*

Finally, defendants contend that the action has been mooted by the expiration of the fiscal year which applied to the grant request at issue. They argue that because the period during which the grant request could be considered has expired, the plaintiffs may no longer obtain the injunctive relief they seek, thus mooting the lawsuit.

 This factor is not necessarily determinative. An action becomes moot when, among other reasons, any relief which the Court can supply is no longer of any use to the plaintiff. The Institute plans to re-apply for AID funding for *Perspectives* next year. *See* Lincoln affidavit of June 8, 1984, at ¶ 2. When it does so, it must apply for funds as a new applicant rather than as a current grantee, which will make it more difficult for *Perspectives* to obtain funding.[8] This residue of the alleged wrongful agency activity continues to harm the Institute and could be corrected through injunctive relief upon a finding that the agency wrongfully failed to renew the grant. Thus an actual controversy persists; the Court can render some meaningful relief.

Further, the Supreme Court has excepted from the mootness doctrine actions

---

7. It appears from plaintiffs' brief that they wish to keep Secretary Shultz in this action primarily to insure that any injunctive relief I may grant will be obeyed. The contempt power of the Court will undoubtedly be just as effective in securing compliance, making his presence for this purpose superfluous.

8. That *Perspectives* has been able to obtain private funds with which to continue publishing is irrelevant to the question of mootness. The journal is harmed simply by having to seek funding elsewhere if the federal funding has been wrongfully denied.

which might otherwise appear moot when "it is 'not absolutely clear,' absent the [relief sought], 'that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980), quoting *United States v. Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). Regardless of whether the expiration of the grant funding period moots the request for reconsideration of the application, it is not "absolutely clear" that plaintiffs will not be subjected to similar treatment when they re-apply. There is no indication that CRB and OMB have changed their policies, and the Institute presumably continues to engage in those activities which allegedly made it a target of agency ire. Thus, under *Vitek,* the mootness doctrine does not reach this action.

## CONCLUSION

To summarize, plaintiffs' Fourth Cause of Action, alleging a denial of due process rights, and Fifth Cause of Action, for review under APA, are dismissed. All claims of the individual plaintiffs and all claims against defendant Shultz are similarly dismissed. The affirmative relief requested by the complaint is barred by sovereign immunity. Declaratory relief is not.[9] The action is not moot.

The parties are directed to proceed with discovery in accordance with the terms of the order accompanying this decision.

## ORDER

By letter, defendants have requested leave to reargue one aspect of my November 27, 1984 Memorandum Opinion and Order. In footnote 5 of the decision, I noted that defendants had not challenged the "facial validity" of the third cause of action. Defendants contend that they did indeed do so, on grounds of sovereign immunity.

As elaborated at page 1539 of the opinion, sovereign immunity is a bar to certain types of relief (such as affirmative injunctions), but it is not a bar to maintenance of a cause of action so long as some permissible relief is available (such as declaratory judgment). Thus the Government's sovereign immunity claim is covered by the second paragraph of footnote 5, which states that "all comments made concerning [relief under the First Amendment claim] are equally applicable to the relief available under this third cause of action." The motion to reargue is denied.

However, the Government makes a fair point about the clarity of footnote 5. The opinion is amended by inserting the following phrase between the words "legitimacy" and "of" in line three of footnote 5: ", on grounds other than sovereign immunity,".

It is so ORDERED.

---

9. Indeed, the Government acknowledges in its reply brief (at 14) the availability of limited "affirmative" relief logically necessary to implement an injunction against First Amendment violations. Assuming plaintiff Institute prevails on its constitutional theory, the Government says, this Court "can award ... an order directing AID to reconsider Guttmacher's application without regard to that constitutionally protected activity."